**PENDLETON CONSTRUCTION CORPORATION, Plaintiff,**

v.

**ROCKBRIDGE COUNTY, VIRGINIA, et al., Defendants.**

Civ. A. No. 84–0157–L.

United States District Court,
W.D. Virginia,
Lynchburg Division.

Jan. 6, 1987.

**314**

David B. Hart, Woodward, Fox, Wooten & Hart, Roanoke, Va., Joel I. Klein, Paul J. Van de Graaf, Robert D. Luskin, Stephen I. Glover, Onek, Klein & Farr, Washington, D.C., for plaintiff.

William C. Plott, Lexington, Va., for defendant Matthew R. Beebe.

Bernard J. Natkin & Franklin D. Munyan, H. David Natkin, Lexington, Va., for defendants Rockbridge County, the Bd. of Sup'rs, Edwards, Moore, Reynolds, Sauder & Trimble.

James G. Welsh, Timberlake, Smith, Thomas & Moses, Staunton, Va., and Howard W. Rhodes, Jr., Rhodes, Jennings & Livingston, Lynchburg, Va., for defendants Barger & Son Const. Co., Matthew R. Beebe & Charles W. Barger, III.

### MEMORANDUM OPINION

KISER, Judge.

Before the Court in this antitrust suit are motions for summary judgment filed on behalf of Plaintiff Pendleton Construction Corporation and on behalf of Defendants Rockbridge County, its Board of Supervisors, and the individual members of the Board, William Edwards, Kenneth Moore, Maynard Reynolds, Nanalou Sauder, and Charles Trimble, and Defendants Charles W. Barger & Son Construction Company, Inc., and two of its officers, Matthew Beebe, and Charles Barger, III. For the reasons discussed below, I shall deny the Plaintiff's Motion for Summary Judgment but grant the Motions for Summary Judgment filed on behalf of all the Defendants.

### I. *Facts*

Plaintiff Pendleton Construction Corporation is a construction company with headquarters in Wytheville, Virginia. Defendant Barger Construction is also a construction company, specializing in performing highway construction and highway repairs. It is a competitor of Plaintiff's and has bid against Plaintiff on various projects in the past. Barger Construction also owns and operates a stone quarry near Lexington, Virginia, in Rockbridge County. Defendant Rockbridge County is responsible for the adoption and implementation of ordinances governing zoning and for decisions to grant or deny conditional use permits under these zoning ordinances.

In the Spring of 1983, the Commonwealth of Virginia's Department of Highways and Transportation announced that it would accept bids from construction companies on a project involving the repair of two sections of Interstate 64 and one section of State Route 629 near Lexington. The project called for 80,000 tons of rock to serve as rock fill. There was no suitable rock at the construction site so Plaintiff considered two other options: first, to solicit quotes from Defendant Barger Construction; and second, to lease property on which abandoned quarries existed for the purpose of mining its own rock. Plaintiff received a bid from Barger Construction to mine and haul the rock needed for the project for the price of $483,200.00 ($3.80 per ton for the rock itself, plus $2.09 per ton to haul the rock to the repair site for a total of $6.05 per ton). Plaintiff, believing the price quoted by Barger Construction to be too high, discussed the possibility of reopening a quarry owned by the McCown family for the price of $286,400.00.

With these figures in mind, Plaintiff submitted a bid of $729,091.00 to the Highway Department. On June 24, 1983, the Highway Department notified Plaintiff of its decision to accept Plaintiff's bid.

The McCown family, acting pursuant to its agreement with Plaintiff, applied to the Rockingham County Board of Supervisors for the renewal of a conditional use permit authorizing the mining of rock at the McCown quarry. On June 27, 1983, the Board of Supervisors renewed the McCown's permit to use the quarry.

Barger Construction, upon finding out about the Board's action, immediately set about opposing renewal of the conditional use permit. For example, Barger contacted all of the Board members to voice his displeasure with the decision. As a result of Barger's efforts, on July 11, 1983, the Board of Supervisors rescinded its June 27, 1983, renewal of the McCown permit, ostensibly because it should have conducted a public hearing before making its final decision. On July 26, 1983, a public hearing was held at which all interested parties presented arguments as to the appropriateness of granting this conditional use permit. During the two preceding weeks, Barger had stepped up his lobbying efforts by contacting McCown quarry neighbors and by writing a letter to the editor of the local newspaper (dated July 18, 1983) suggesting, among other things, that the County should support its local businesses. After a full discussion, the Board voted to deny renewal of the conditional use permit. Soon thereafter, on August 19, 1983, Pendleton Construction filed a Motion for Declaratory Judgment in state court against the Board of Supervisors and the County Zoning Administrator. In an Opinion dated September 29, 1983, Circuit Court Judge George E. Honts, III, determined that: (1) the Board's June 27, 1983, renewal of the

McCown quarry conditional use permit was null and void and vested the applicants with no rights under state law because of the Board's failure to hold a public hearing; (2) the Board's rescission of the void permit on July 11, 1983, was, therefore, of no legal effect; and (3) the Board's action of July 26, 1983, was also defective because the County Zoning Administrator did not submit the request to the County Planning Commission for review and recommendation as required by the County Zoning Ordinance.[1] Subsequently, when the McCown's application for a permit was passed through the proper channels and according to all the proper procedures, the Board denied the permit once again (October 26, 1983, public hearing).

Soon after the adverse July 26, 1983, Board decision, Plaintiff sought to reopen an abandoned quarry owned by the Womeldorf family. The Womeldorfs filed an application for a conditional use permit on August 4, 1983. On August 17, 1983, the Rockingham County Planning Commission recommended denial of the permit. On August 23, 1983, the Board of Supervisors, after holding a public hearing and after further lobbying efforts on behalf of Barger Construction, agreed with the Planning Commission and denied the permit.[2]

Pendleton Construction next attempted to secure the rock needed for the repairs from land at that time occupied by Lime Kiln Arts, Inc., a non-profit corporation that had been producing plays on the property. Lime Kiln had been leasing the property from an individual by the name of Brewster Ford. Plaintiff proposed to convert the existing quarry pit into an outdoor amphitheater in exchange for allowing Plaintiff to haul off the excess rock. Plaintiff applied for a building permit rather than a conditional use permit, considering this to be a construction project, not a

---

**1.** Pendleton Construction appealed Judge Honts' decision to the Virginia Supreme Court. Because no petition for appeal was ever filed, the Court dismissed the appeal on December 29, 1983. Two other state-court suits filed by Pendleton Construction were voluntarily nonsuited

on February 23, 1984, about six months prior to the filing of this federal suit.

**2.** Throughout this application process, Barger Construction was trying to put the heat on Pendleton Construction to accept its bid by raising periodically its price for the rock by 10¢ a ton.

mining project. Before the Rockbridge County Building Inspector had an opportunity to make his decision in regard to the permit, Ford, invoking a provision of his lease with Lime Kiln decided not to allow the construction to go forward after he received a number of complaints from neighbors, induced perhaps by Barger, about the potential dangers of blasting and traffic.

Subsequently, Plaintiff attempted to secure permits to mine several other abandoned quarries. The Board of Supervisors denied all of these permits. Plaintiff eventually obtained the rock it needed to make the repairs,[3] but not without some delay and at a higher price than it had expected to pay. As a result of these problems, Plaintiff filed this suit.

In its Complaint, Pendleton Construction asserts violations of federal law in the first five counts and violations of state law in the next four counts. In Count I, Plaintiff alleges a conspiracy on the part of Defendants to restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. In Counts II, III and IV, Plaintiff alleges that Defendants monopolized, attempted to monopolize, and conspired to monopolize the mining and sale of rock in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. In Count V, Plaintiff alleges that it was deprived of due process of law in violation of the Fourteenth Amendment to the Constitution of the United States and .42 U.S.C. § 1983. In Count VI and VII, Plaintiff alleges violations of the Virginia Antitrust Act, *Va. Code* § 59.1–9.6, *et seq.* In Count VIII, Plaintiff alleges that Defendants conspired to injure Plaintiff's reputation in business in violation of *Va. Code* § 18.2–499 and 500. Finally, in Count IX, Plaintiff alleges that Defendants are liable for tortious interference with contract.

## II. *Discussion*

Throughout this discussion, I rely heavily on *Racetrac Petroleum, Inc. v. Prince*

*George's County,* 601 F.Supp. 892 (D.Md. 1985), *aff'd,* 786 F.2d 202 (4th Cir.1986). In *Racetrac,* the plaintiff, a gasoline retailer and frustrated applicant for a zoning special exception in Prince George's County, sought damages for alleged violations of Sections 1 and 2 of the Sherman Antitrust Act, the Fourteenth Amendment to the Constitution of the United States, and 42 U.S.C. § 1983, and state law from the County, various public officials, a state-created planning commission, and a local trade association of gasoline retailers as well as one of its former officers, which, through its members, had opposed the zoning exception requested by the plaintiff.

The district court (Judge Ramsey) in a very thorough and well-reasoned Opinion held that: (1) the governmental bodies were immune from antitrust liability based on the state action doctrine of *Parker v. Brown;* (2) the trade association and its officer were immune from liability for both antitrust and civil rights claims based on the *Noerr-Pennington* doctrine; (3) the plaintiff was not deprived of due process of law; and (4) the individual governmental defendants were entitled to public official immunity. The United States Court of Appeals for the Fourth Circuit affirmed on the basis of the district court's opinion, as supplemented by two of the Supreme Court's recent decisions on the state action doctrine: *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); and *Fisher v. City of Berkeley, California,* — U.S. —, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986). The issues raised by Plaintiff Pendleton Construction in this case are nearly identical to those raised by plaintiff in *Racetrac;* therefore, I find that much of *Racetrac* is dispositive of most of the issues in the case presently before me.

### A. *State Action Doctrine*

Defendants Rockbridge County, Virginia and Rockbridge County's Board of Supervi-

---

**3.** Pendleton Construction obtained the majority of the rock it needed for the repair project at the Lone Jack Limestone quarry, same distance from the repair sites. Pendleton Construction also secured some already loose rock from several other quarries: McCown, Rowe, Watts, and Rieff.

sors assert that they are immune from antitrust liability based on the state action doctrine of *Parker v. Brown*, 317 U.S. 341, 350–52, 63 S.Ct. 307, 313–14, 87 L.Ed. 315 (1943). This exemption is grounded upon the notion that the sovereignty of the states in our federal system precludes a finding that Congress intended to create liability for state action when it enacted the antitrust laws. *Id.* at 351, 63 S.Ct. at 313. *See also Commuter Transportation Systems, Inc. v. Hillsborough County Aviation Authority*, 801 F.2d 1286 (11th Cir. 1986).

In *City of Lafayette v. Louisiana Power & Light Co.*, 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), the Supreme Court discussed the circumstances under which municipalities may also be entitled to the benefit of this immunity. The Supreme Court concluded that the *Parker* doctrine exempts not only "anticompetitive conduct engaged in as an act of government by the State as sovereign," but also anticompetitive conduct engaged in "by its subdivisions, pursuant to state policy to displace competition with regulation or monopoly public service." *Id.* at 413, 98 S.Ct. at 1137. In order for the municipality to gain immunity, however, the Court stated that the anticompetitive state policy must be "clearly articulated and affirmatively expressed as state policy." [4]

In *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985), the Supreme Court fully considered, for the first time, how clearly a state policy must be articulated for a municipality to be able to establish that its anticompetitive

activity constitutes state action. At issue in *Town of Hallie* was whether the city was protected by the state action immunity doctrine in a suit in which the town alleged that the city used its monopoly over sewage treatment to gain an unlawful monopoly over the provision of sewage collection and transportation services in violation of the Sherman Act. Wisconsin statutes granted authority to cities to construct, add to, alter, and repair sewage systems, and this authority included the power to "describe with reasonable particularity the district to be [served]." *Id.* at 40–41, 105 S.Ct. at 1717–18 (citing the Wisconsin Code). The statutes, moreover, granted cities operating public utilities the right to fix "by ordinance * * * the limits of such service in unincorporated areas" and stated that these municipal utilities "shall have no obligation to serve beyond the area so delineated." *Id.* at 41, 105 S.Ct. at 1718 (citing the Wisconsin Code). These broad authorizations to regulate, the Court concluded, were sufficient to satisfy the clear articulation requirement of the state action test. *Id.* at 43, 105 S.Ct. at 1719.[5]

■ In light of *Town of Hallie*, I now turn to the question of whether the Commonwealth of Virginia "clearly articulated and affirmatively expressed" an anticompetitive state policy when it delegated to its subdivisions the authority to regulate the uses of land.

*Va. Code* §§ 15.1–486 through 498 provide for the delegation of zoning authority to the Commonwealth's localities. In particular, *Va. Code* 15.1–486 provides:

**4.** In *City of Lafayette*, the Court also suggested, without deciding, that in order for a municipality to gain *Parker* immunity, the state must have "actively supervised" the municipality's implementation of the state's anticompetitive policy. 435 U.S. at 410, 98 S.Ct. at 1135. When District Court Judge Ramsey decided *Racetrac*, 601 F.Supp. 892 (D.Md.1985), *aff'd.*, 786 F.2d 202 (4th Cir.1986), it was unclear whether municipalities did in fact have the burden of proving "active state supervision". Recently, however, the Supreme Court has concluded that "the active state supervision requirement should not be imposed in cases in which the actor is a municipality." *Town of Hallie v. City of Eau Claire*,

471 U.S. 34, 105 S.Ct. 1713, 1720, 85 L.Ed.2d 24 (1985). Therefore, in making my state action determination, I need only consider whether Virginia has a "clearly articulated and affirmatively expressed" anticompetitive state policy.

**5.** *See also, Fisher v. City of Berkeley, California*, — U.S. —, 106 S.Ct. 1045, 89 L.Ed.2d 206 (1986) (although the majority of the Court disposed of the case on preemption grounds, Justice Powell, in his concurrence, argued that the City, when it passed a rent control ordinance, was immune from antitrust liability based on the state action doctrine of *Parker v. Brown* ).

The governing body of any county or municipality may, by ordinance, classify the territory under its jurisdiction or any substantial portion thereof into districts of such number, shape and size as it may deem best suited to carry out the purposes of this article, and in each district it may regulate, restrict, permit, prohibit, and determine the following:

(a) The use of land, buildings, structures and other premises for agricultural, business, industrial, residential, flood plain and other specific uses;

(b) The size, height, area, bulk, location, erection, construction, reconstruction, alteration, repair, maintenance, razing, or removal of structures;

(c) The areas and dimensions of land, water, and air space to be occupied by buildings, structures and uses, and of courts, yards, and other open spaces to be left unoccupied by uses and structures, including variations in the sizes of lots based on whether a public or community water supply or sewer system is available and used;

(d) The excavation or mining of soil or other natural resources.

(e) [Repealed.]

For the purpose of zoning, the governing body of a county shall have jurisdiction over all the unincorporated territory in the county, and the governing body of a municipality shall have jurisdiction over the incorporated area of the municipality.

Moreover, *Va.Code* § 15.1–489 provides that the purpose of zoning ordinances shall be, among other things:

(6) to protect against one or more of the following: overcrowding of land, undue density of population in relation to the community facilities existing or available, obstruction of light and air, danger and congestion in travel and transportation, or loss of life, health, or property from fire, flood, panic or other dangers;

(7) to encourage economic development activities that provide desirable employment and enlarge the tax base.

*See also, Va.Code* § 15.1–490 ("Matters to be considered in drawing and applying zoning ordinances and districts"); and § 15.1–491 ("Permitted provisions in ordinances; amendments").

Although there are no cases to my knowledge in which these Virginia statutes delegating the zoning authority to localities have been analyzed in terms of the state action doctrine of *Parker v. Brown,* the applicability of state action immunity to localities in the State of Maryland (which state had delegated to its counties the power to plan, zone, and decide special exceptions regarding the location and use of buildings and land for commercial purposes) was authoritatively decided in *Racetrac Petroleum, Inc. v. Prince George's County,* 601 F.Supp. 892 (D.Md.1985), *aff'd.,* 786 F.2d 202 (4th Cir.1986). In *Racetrac,* the district court held that the Maryland statutes constituted "a clearly articulated and affirmatively expressed state policy to displace free competition among landowners and users of land with local regulation by zoning and planning." 601 F.Supp. at 906, *aff'd.* 786 F.2d 202 (4th Cir.1986) (the district court also stated that "[e]qually clear is the anticompetitive impact that such restrictions and regulations necessarily have on landowners' otherwise unfettered right to use their land as they please." *Id.*) Moreover, the court held that "such regulation by zoning and planning, including the use of criteria which take into account the public's need for a proposed use in a given area, and its anticompetitive impact were within the contemplation and authorization of the state legislature." 601 F.Supp. at 906, *aff'd,* 786 F.2d 202.

I do not believe that Maryland's zoning statutory scheme differs in any significant respect with Virginia, therefore, I find *Racetrac* to be dispositive of the issue of Rockbridge County and its Board of Supervisors' antitrust liability. My decision is reinforced by *Town of Hallie v. City of Eau Claire,* in which the Supreme Court held that a state's broad authorizations to regulate are sufficient to satisfy the clear articulation requirement of *Parker v.*

*Brown's* state action doctrine, 471 U.S. 34, 105 S.Ct. 1713, 1719, 85 L.Ed.2d 24 (1985).

### B. *Noerr-Pennington Doctrine*

Barger Construction and two of its officers, Mathew Beebe and Charles Barger, III, assert that they are immune from antitrust liability based on the *Noerr-Pennington* doctrine. In *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), the Supreme Court was faced with the question of whether a lobbying campaign by the railroad industry designed to encourage Congress to adopt legislation that would limit competition by truckers violated the antitrust laws. The court held that organized efforts to influence legislation are protected under the First Amendment regardless of the presence of anticompetitive intent. The Supreme Court reaffirmed and extended the boundaries of *Noerr* in two of its subsequent decisions, *United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965), and *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).

Plaintiff Pendleton Construction acknowledges that some of the Barger Defendants' conduct may be protected under *Noerr-Pennington*. Pendleton argues, however, that the bulk of the Barger Defendants' conduct is not protected because it either falls outside of the scope of *Noerr-Pennington* because it is not concerned with the political process or, although ostensibly concerned with the political process, falls within the so-called "sham" exception to the *Noerr-Pennington* doctrine.

The Supreme Court first recognized this "sham" exception in *Noerr*. In *Noerr* the Supreme Court stated that "[t]here may be situations in which a publicity campaign, ostensibly directed towards influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor, and the application of the Sherman Act would

be justified." 365 U.S. at 144, 81 S.Ct. at 533. After examining the railroad's conduct in *Noerr*, however, the Supreme Court found that no sham existed because "the railroads were making a genuine effort to influence legislation and law enforcement practices." *Id.*

In *California Motors*, the Supreme Court further delineated the scope of the sham exception. First, the Court explained that where a defendant's petitioning is used not to influence the governmental body but "to harass and deter [competitors] in their use of administrative and judicial processes" so as to deny them access to the tribunals is conduct which comes within the sham exception. Second, the Court suggested that the sham exception would encompass other unethical conduct in the setting of the adjudicatory process such as bribery, perjury, misrepresentation, or the bringing of baseless, repetitive claims amounting to abuse of process where such abuse of process effectively bars competitors from access to the decision-making bodies. 404 U.S. at 511–13, 92 S.Ct. at 612–13. In *California Motors*, the Supreme Court decided that the facts supported the applicability of the sham exception. *See also Hospital Building Company v. Trustees of the Rex Hospital*, 791 F.2d 288, 292 (4th Cir.1986) (adopting Professor Areeda's definition of the sham exception, *Antitrust Law*, ¶ 203.1a: [T]he basic concept, as employed by the Supreme Court, is that the defendant's activity was intended to injure the plaintiff directly rather than through a governmental decision. When the antitrust defendant had not truly sought to influence a governmental decision, his invocation of governmental machinery is sham. To be sure, he would always be pleased to obtain a governmental decision against his rival. But where he had no reasonable expectation of obtaining the favorable ruling, his effort to do so was a sham.)

In the case presently before this Court, Plaintiff Pendleton Construction argues that the Barger Defendants' conduct falls squarely within this sham exception. In

particular, Pendleton Construction argues that there is clear cut evidence of corruption (primarily in the way of misrepresentations) and of a conspiracy between the County Defendants and the Barger Defendants.

*Racetrac* considered the sham exception in circumstances very similar to this case. At issue in *Racetrac* was whether an association of gasoline retailers, which opposed plaintiff's efforts at several public hearings to secure a special exception permit for the operation of a retail gasoline outlet, was immune from antitrust liability based on the *Noerr-Pennington* doctrine. The trial court held that immunity was appropriate because plaintiff had produced no evidence to bring the case within the sham exception to *Noerr-Pennington. Id.* at 911, *aff'd,* 786 F.2d 202.

In explaining its decision, the court in *Racetrac* first noted that the association defendants' actions:

> ... had neither the purpose nor effect of barring plaintiff's access to governmental process. At every stage at which Racetrac's application was reviewed, and before every body considering plaintiff's application, plaintiff was afforded a full opportunity to present its views and to support them with evidence. At each stage, plaintiff's views were considered and rejected as insufficient to meet the standards of applicable zoning ordinances. Plaintiff had the opportunity under Maryland law to have its denial reviewed in the Circuit Court of Prince George's County, a right which plaintiff initially asserted and then waived by voluntary dismissal of its appeal. [footnotes omitted].

*Id.*

Second, the Court in *Racetrac* found no evidence of any abuse of process on the part of the association defendants. Because the plaintiff, not the defendants, had initiated all the proceedings, any suggestions that plaintiff had been subjected to frivolous claims was without foundation. Moreover, there was no evidence of plaintiff's allegations of a conspiracy between the association defendants and the county defendants. *Id.*

■ In our case, it appears that the lobbying efforts of the Barger Defendants were more extensive than were the efforts of the association defendants in *Racetrac* in that the Barger Defendants lobbied not only the governmental decisionmakers, but also the local citizenry (who in turn lobbied public officials on behalf of the Bargers). Nonetheless, the facts in *Racetrac* so often parallel the facts in our case that I find *Racetrac* to be highly persuasive in regard to the applicability of the sham exception. Like the actions of the association defendants in *Racetrac*, the actions of the Barger Defendants "had neither the purpose nor effect of barring plaintiffs access to governmental process." Moreover, like plaintiff in *Racetrac*, Pendleton Construction has failed to show any abuse of process on the part of the Defendants. To the contrary, the evidence is that the Barger Defendants prevailed before both the Board of Supervisors and the Circuit Court of Rockbridge County. Such success belies any sham use of the governmental process. Nor do I find evidence sufficient to survive a motion for summary judgment to support allegations of misrepresentation, bribery, perjury, etc. so as to fall within the sham exception.

Because Pendleton Construction has failed to prove that the Barger Defendants' efforts to lobby the County Defendants (either directly, or indirectly through other constituents) were a sham, *see, Hospital Building Company v. Trustees of the Rex Hospital,* 791 F.2d at 292 (4th Cir.1986) (held that the complainant in an antitrust suit is the party who has the burden of proving that its competitor's conduct was a sham), I find that the Barger Defendants are entitled to *Noerr-Pennington* immunity.

Pendleton Construction argues that even if the Barger Defendants' dealings with the county officials fall within the protection of the *Noer-Pennington* doctrine, Barger Defendants engaged in activities which did not involve the members of the Board of

Supervisors and, therefore, were outside of the protection of the *Noer-Pennington* doctrine. The incidents that the Plaintiff alludes to are three in number. They are: (1) activities of the Barger Defendants in opposing and defeating the Plaintiff's attempt to quarry stone at the Lime Kiln site; (2) a refusal of the Barger Defendants to lease a quarry site owned by the Womeldorf family trust; and (3) an effort by the Barger Defendants to persuade Benny Chaplin to break his contract with the Plaintiff granting an easement of way over Chaplin's property for the hauling of stone.

Plaintiff asserts that the Barger Defendants had a monopoly on the quarrying and sale of limestone within the relevant market area and that, therefore, the Barger Defendants' activities as enumerated above violated Section 2 of the Sherman Act in that the Plaintiff engaged in this conduct to maintain a monopoly or in an attempt to monopolize the relevant market.[6]

 As a general proposition of law, the Plaintiff is correct in asserting that it is illegal for a monopolist to do any act or acts to maintain his monopoly, and it is also illegal for a person to do any acts with the specific intent of attempting to create a monopoly where there is a reasonable probability that a monopoly can be established. However, not all acts, regardless of their nature, will support a claim of maintenance or attempt. The type of acts referred to in

the literature envision a misuse of economic power or some tortious type of conduct. *See*, ABA Antitrust Section, Antitrust Law Developments (2d Ed.1984), pp. 121–144. For instance, a monopolist can advertise his product in an effort to maintain or gain a bigger market share. *Berkey Photo, Inc. v. Eastman Kodak*, 603 F.2d 263 (2d Cir. 1979). Thus, it is necessary to examine the enumerated instances to see if the Bargers' conduct was of the kind forbidden to monopolist.

### The Lime Kiln Episode

Plaintiff asserts that it had entered into a tentative agreement with the tenants of the Lime Kiln site whereby the Plaintiff would remove rock from the site in such a manner as to create an amphitheatre. To do this did not require a conditional use permit, but only a building permit which could be granted by the Rockbridge County Building Inspector. Plaintiff was not able to conclude this arrangement because of the following actions by the Barger Defendants.

1. Barger urged Ford (owner/lessor) to oppose the Plaintiff's obtaining stone from the kiln site.

2. Barger sent out fliers to neighbors to generate opposition to the Plaintiff's obtaining stone from the kiln site mentioning the possible traffic hazzard.

---

**6.** I will assume for the sake of argument that the Barger Defendants did have a monopoly on the crushed stone market, however, this is a quantum leap for the Court to make. The evidence strongly points to the conclusion that the Barger Defendants simply happened to be in the right place at the right time. Accepting the Plaintiff's evidence, it points to the fact that there was a relatively short term market involved, i.e. the repair of Interstate 64. Upon the completion of this project, it is obvious that the Barger quarry would lose the advantage that it had in being in close proximity to the project. I doubt seriously that a relevant market can be predicated upon a single construction project. The Barger monopoly, if one existed, was a "natural monopoly" which came about by a coalescing of circumstances rather than by impermissible activities on the part of the Bargers. In this regard, *see Stearns v. Genrad, Inc.*, 752 F.2d 942 (4th Cir.1984). "[T]he defendant may

escape statutory liability if ... it owes its monopoly solely to ... natural advantages (including accessibility to raw materials or markets....)." ABA Antitrust Section, Antitrust Law Developments (2d Ed.1984), p. 122, *quoting from United States v. United Machinery Corp.*, 110 F.Supp. 295 (1953).

Also, to follow the Plaintiff's argument that the Barger Defendants' activities were in furtherance of the maintenance of a monopoly and an attempt to monopolize requires a bit of mental gymnastics. If the Barger Defendants had a monopoly, then it is obvious a charge of attempt to monopolize would not lie under Section 2 of the Sherman Act. By the very definition of the offense, an attempt is something which falls short. Logically, the Barger Defendants could either have a monopoly, which they undertook to maintain, or they did not have a monopoly and were attempting to establish one, but they could not do both.

3. Barger encouraged the Lime Kiln neighbors to actively oppose Plaintiff's use of the property.

4. Barger Defendants pressured Patterson (Rockbridge County Building Inspector) not to issue the building permit.

5. Barger Defendants persuaded Columbia Gas Pipe representative not to give its needed consent to Plaintiff's removal of the stone. This consent was needed because Columbia Gas Pipe had a gas pipeline running near the vicinity of the Lime Kiln site.

6. Barger and Beebe attended meetings of the Lime Kiln neighbors and spoke against Plaintiff's proposed project.

7. Barger circulated a petition among the Lime Kiln neighbors opposing the Plaintiff's project and obtained signatures thereon.

### Womeldorf Incident

Plaintiff had entered into a contract with the Womeldorf family trust to obtain stone from the land owned by the trust. Barger met with Mr. Spencer, an attorney who represented the Womeldorf family and was the Plaintiff's attorney at the time as well, and proposed entering into a long-term contract for the right to quarry stone on the Womeldorf property. Barger made this conditional, however, on the condition that the Plaintiff not be given a short-term lease. Unbeknownst to Barger, the Plaintiff already had a short-term lease with the trust, and when Barger learned of this, he declined to enter into a long-term lease for the Womeldorf property. The Barger Defendants also opposed the Plaintiff being granted a conditional use permit to quarry the Womeldorf property.

### The Chaplin Incident

Plaintiff had an easement to haul stone over the Chaplin property. It alleged that the Defendants sought to persuade Chaplin to breach or cancel this easement.

These actions neither separately or collectively are the kind which are forbidden to a monopolist or a would-be monopolist with the possible exception of the Chaplin incident. They involve no use of economic power nor are they in any way oppressive or coercive. They were simply an expansion and a continuation of Bargers' efforts to persuade the community and the individuals therein to their side of the fray. The Bargers were advertising and selling their point of view as juxtaposed to the Plaintiff's point of view. Moreover, much of the Bargers' efforts were expended in attempting to indirectly pressure the Board of Supervisors and as such would fall within the protection of *Noerr-Pennington.*

As to the Chaplin incident, it could possibly be argued that the Bargers were guilty of tortious conduct of interference with a contractual relationship if they had, in fact, attempted to get Mr. Chaplin to break his easement contract with the Plaintiff. However, the record does not support such an allegation. Bargers deny the charge and Mr. Chaplin in his affidavit denies the Bargers ever attempted to persuade him to breach his contract.

Moreover, since Chaplin did not breach his contract I fail to see how the Plaintiff could show any damages flowing from this action even if it did amount to an attempt to monopolize. The same could be said for the Womeldorf incident because Bargers' actions in no way injured the Plaintiff. If anyone was injured in that incident, it would have been the Womeldorf trust.

Accordingly, I grant judgment to the Barger Defendants on the antitrust claims.[7]

### C. Due Process of Law

Plaintiff Pendleton Construction asserts that Defendants Rockbridge County, the Board of Supervisors, and the individual

---

**7.** Insofar as Pendleton Construction has alleged, if at all, that the Barger Defendants violated Pendleton Construction's civil rights in violation of 42 U.S.C. § 1983, I hold that *Noerr-Penning-* *ton* immunity extends to this § 1983 claim, as well as the antitrust claim. *Racetrac,* 601 F.Supp. at 912, *aff'd.,* 786 F.2d 202 (4th Cir. 1986).

members of the Board violated Pendleton's procedural due process rights under the Fourteenth Amendment to the United States Constitution and pursuant to 42 U.S.C. § 1983 by: (1) failing to formulate satisfactory conditions for the conditional use permits before denying Plaintiff's applications for those permits; (2) failing to provide statements of reasons when denying those applications; (3) asking for a show of hands at public hearings when those applications were considered; and (4) unjustifiably delaying issuance of an officially approved permit in violation of the Fourteenth Amendment.

■ In order to make out a procedural due process claim, the claimant must show first that he was denied a liberty or property interest, and second that such denial was done without following the appropriate procedures. Assuming, without deciding, that Pendleton Construction had a protectable property interest in securing the various permits it sought, the question becomes whether Pendleton received all the process it was due. I believe that it did.

As a preliminary matter, I note that I need not even consider whether Pendleton Construction was afforded all the appropriate procedures insofar as the Board's actions on June 27, 1983; July 11, 1983; and July 26, 1983, in light of Judge Honts' determination that the Board's actions on these dates were without legal effect (because the permits at issue on these dates have already been litigated and appealed, Pendleton Construction is collaterally estopped from challenging the Board's actions on these dates again).

■ With regard to the Board's actions on other dates, I think Pendleton Construction received all the process it was due. Due process requires only that there be adequate notice and a meaningful opportunity to be heard. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976); *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). There's no question that Pendleton Construction was given the appropriate notice. Moreover, there's no question that Pendleton

Construction was given a meaningful opportunity to be heard: at all public hearings, Plaintiff was represented by competent counsel who presented evidence on behalf of Pendleton Construction.

In regard to Pendleton Construction's particular complaints about the Board's handling of its permits, I find, first of all, no evidence that the Board unjustifiably delayed ruling on the permits. Next, I find no constitutional violation in the Board's request for a show of hands at the public hearings. Finally, Pendleton Construction's assertion that the Board was obligated to formulate conditions for granting or denying permits and to provide a statement of reasons is also without foundation. Insofar as the Supreme Court has held that a statement of reasons is an element of due process in the context of denying welfare benefits, *Mathews*, 424 U.S. at 346, 96 S.Ct. at 908; *Goldberg*, 397 U.S. at 271, 90 S.Ct. at 1022. I find these cases to be distinguishable based on the facts of our case. In making my decision in regard to the due process claim, I have also relied upon *Racetrac*, 601 F.Supp. at 914, *aff'd*, 786 F.2d 202 (4th Cir.1986).

### D. *Public Official Immunity*

Defendants Edwards, Moore, Reynolds, Sauder, and Trimble, the individual members of the Rockbridge County Board of Supervisors, assert that they are immune from liability for their actions in denying Pendleton Construction's permit applications because they are public officials. In particular, they argue that they enjoy absolute legislative immunity.

In support of their argument, the individual county defendants cite *Bruce v. Riddle*, 631 F.2d 272 (4th Cir.1980), in which a landowner had filed suit against the Greenville County, South Carolina County Council members seeking damages for diminution in value of his property which allegedly had resulted from rezoning. The Fourth Circuit held that county legislators are entitled to absolute legislative immunity when they function in a legislative ca-

pacity. *Id.* at 279. Moreover, the court noted that the defendants did not lose their absolute immunity by meeting privately with interested individuals who tended to influence their vote on the zoning ordinances ("[m]eeting with 'interest' groups, professional or amateur, regardless of their motivation, is a part and parcel of the modern legislative procedures through which legislators receive information possibly bearing on the legislation they are to consider". *Id.* at 280).

Pendleton Construction, on the other hand, asserts that absolute immunity is inappropriate under the facts of our case. In support of its argument, it cites *Scott v. Greenville County*, in which the Fourth Circuit held that Greenville County, South Carolina County Council members who sought to prevent administrators from issuing a building permit could claim only qualified immunity, not absolute legislative immunity. 716 F.2d 1409, 1422–23 (4th Cir. 1983). In *Scott*, the Fourth Circuit refused to confer absolute immunity upon the council members because the council members, in seeking to block the permit, were not acting in their legislative capacities under South Carolina law. In fact, the local ordinance barred council members from involvement in the permit-issuing process. *Id.*

■ I think that the facts in our case are much closer to the facts in *Bruce v. Riddle* than in *Scott v. Greenville County*. Therefore, I believe that the individual county members are entitled to absolute immunity if their actions in ruling on Pendleton Construction's conditional use permit applications can be considered a "legislative" function under Virginia law.

The Virginia Supreme Court has held that "[z]oning is a legislative power vested in the Commonwealth and delegated by it, in turn, to various local governments for the enactment of local zoning ordinances."

*Byrum v. Board of Supervisors of Orange County*, 217 Va. 37, ——, 225 S.E.2d 369, 371 (1976). Specifically, the Virginia Supreme Court has held that "when the governing body of a county reserves unto itself the right to issue special exceptions or use permits, the issuance of such permits is a legislative function." *Id.* 225 S.E.2d at 372, *reaffirming, Chesterfield Civic Association v. Board of Zoning Appeals of Chesterfield County*, 215 Va. 399, 209 S.E.2d 925 (1974). *See also, Board of Supervisors of Fairfax County v. The Southland Corporation*, 224 Va. 514, 522, 297 S.E.2d 718, 722 (1982) ("the power to grant or deny special exceptions or use permits—[is] a legislative, rather than an administrative act").

■ In our case, there's no question that Rockbridge County has reserved unto itself the right to issue conditional use permits, *see*, Rockbridge County Zoning Ordinance, Section 501.02. For this reason, and because I believe the individual County Defendants acted within the scope of their legislative authority in all matters concerning the permit applications of the Pendleton Construction Corporation, I hold that absolute legislative immunity is appropriate under these circumstances.[8]

■ In the alternative, however, I note that even if absolute immunity is inappropriate, the individual County Defendants are entitled to qualified immunity. Under *Harlow v. Fitzgerald*, the officials need only show that their conduct did not violate any "clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). Although Pendleton Construction asserts that the individual County Defendants violated a "clearly established" right when, in denying the permit applications, they refused to give a statement of rea-

---

**8.** My decision in regard to the applicability of absolute legislative immunity to the individual County Defendants is reinforced by *Racetrac*, 601 F.Supp. 892 (D.Md.1985), *aff'd.*, 786 F.2d 202 (4th Cir.1986). Although District Judge Ramsey found no need to decide the issue of absolute immunity because he found that the individual county defendants were entitled to qualified immunity, he considered the defendants' arguments in regard to absolute immunity very persuasive. *Id.*, 601 F.Supp. at 915–916.

sons, I do not believe, as I have stated earlier, that the Board violated Pendleton Construction's due process rights when it failed to give reasons for its decision. Therefore, I hold that even if the individual County Defendants are not entitled to absolute legislative immunity, they are entitled to qualified immunity.

### E. *Pendent State Claims*

In regard to the state claims and in light of my decision in regard to the federal claims filed against the Defendants, I choose not to exercise my discretionary pendent jurisdiction. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well.")

### ORDER

For the reasons set forth in a Memorandum Opinion filed this date, it is hereby ADJUDGED and ORDERED that:

1. The Motion for Summary Judgment filed on behalf of Plaintiff Pendleton Construction Corporation shall be DENIED as to all of the federal claims.

2. The Motion for Summary Judgment filed on behalf of Defendants Rockbridge County, its Board of Supervisors, and the individual members of the Board, William Edwards, Kenneth Moore, Maynard Reynolds, Nanalou Sauder, and Charles Trimble shall be GRANTED as to all of the federal claims.

3. The Motion for Summary Judgment filed on behalf of Defendants Charles W. Barger & Son Construction Company, Inc., and two of its officers, Matthew Beebe and Charles Barger, III, shall be GRANTED as to all of the federal claims.

4. Pendleton Construction's state claims shall be dismissed without prejudice for lack of independent jurisdiction.

The Plaintiff has also filed a motion to disqualify counsel for the Rockbridge County Defendants. Because of the Court's action on the motions for summary judgment, this motion has become moot and is, therefore, DENIED.

5. The Clerk is directed to send a certified copy of this Order to all counsel of record.

6. And nothing further remaining to be done in this case, it is hereby dismissed and stricken from the active docket of this Court.