**OMNI OUTDOOR ADVERTISING, INC., Plaintiff–Appellant,**

v.

**COLUMBIA OUTDOOR ADVERTISING INC.; J. Willis Cantey; the City of Columbia, Defendants–Appellees.**

No. 88–1388.

United States Court of Appeals, Fourth Circuit.

Argued May 9, 1989.

Decided Dec. 15, 1989.

Rehearing and Rehearing En Banc Denied Feb. 15, 1990.

See also 566 F.Supp. 1444.

1128

Arthur Camden Lewis (Keith M. Babcock, Lewis, Babcock, Pleicones & Hawkins, Randall M. Chastain on brief), for plaintiff-appellant.

Harry Augustus Swagart, III (Swagart & Lengel, P.A., on brief), James Shelton Meggs, City Atty. (Roy D. Bates, City Atty., Heyward E. McDonald, McDonald, McKenzie, Fuller, Rubin & Miller, David W. Robinson, II, Robinson, McFadden & Moore, P.A., Columbia, S.C., on brief), for defendants-appellees.

Before SPROUSE and WILKINS, Circuit Judges, and HADEN, Chief District Judge.*

SPROUSE, Circuit Judge:

The underlying action involves a claim by a billboard company that a rival billboard company and a city government successfully conspired to keep it out of the city. Suit was initiated in 1982 by appellant Omni Outdoor Advertising, Inc. (Omni) against the alleged conspirators, Columbia Outdoor Advertising, Inc. (COA), J. Willis Cantey, and the City of Columbia, South Carolina (City), for violation of sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. §§ 1–2, as well as pendent state claims. Omni sought treble damages under section 4 of the Clayton Act, 15 U.S.C. § 15, and damages under various state laws, including the South Carolina Unfair Trade Practice Act (UTPA), S.C.Code Ann. § 39–3–30 (Law. Co-op.1985). In addition to monetary damages, Omni sought injunctive relief, costs and attorneys' fees.

The case went to trial on an issue of Sherman Act section 1 restraint of trade, multiple issues of section 2 monopolization and an issue of unfair trade practices under the South Carolina UTPA. The jury, after a three-week trial in 1986, returned a verdict in favor of Omni, finding both the City of Columbia and COA liable for violations of sections 1 and 2 of the Sherman Act and finding COA had violated the South Carolina Unfair Trade Practices Act.

The district court awarded damages against COA in the amounts of $600,000 for violation of section 1 of the Sherman Act, $400,000 for violation of section 2 of the Sherman Act, and $11,000 for violation of the South Carolina Unfair Trade Practices Act. Judgment was entered for Omni on February 7, 1986, for those amounts. Because the district court had earlier granted the City a Local Government Antitrust Act, 15 U.S.C. §§ 34–36, exclusion from damages liability, the verdict against the City awarded no monetary damages. The trial court did not then act on Omni's motion for injunctive relief against the City. The defendants timely moved for a judgment notwithstanding the verdict or for a new trial. Some two-and-a-half years

_____

* For the Southern District of West Virginia, sitting by designation.

later, in November 1988, the district court granted the City's and COA's motions for judgment notwithstanding the verdict and denied Omni's motions for injunctive relief and for an order trebling the damages and attorneys' fees. Omni now appeals the grant of the JNOV and the denial of its motions.

We consider the evidence bearing on the resolution of the issues on appeal in a light most favorable to support the jury verdict. *Foster v. Tandy Corp.*, 828 F.2d 1052, 1055 (4th Cir.1987). Our expression of the evidence is, of course, shaped by the requirements of that rule.

For a period of more than forty years, COA had conducted its outdoor advertising business in the Columbia market.[1] It enjoyed a dominant position, owning more than ninety-five percent of the off-premises billboards in the area. Omni first tried to enter the outdoor advertising market in Columbia in 1981. It surveyed the Columbia market and determined that, COA's dominant position notwithstanding, local regulations and market gaps favored Omni's entry into the market. When informed of Omni's entry, officials of COA became alarmed and attempted to insure continuation of COA's dominant position. They investigated Omni's background of performance in other communities. COA's chairman traveled to other communities and acquired and studied copies of ordinances from other cities that imposed restrictions on outdoor advertising.

Omni's evidence showed the personal and political influence of COA's owners with state and city officials, COA threats to use that influence to block Omni from the Columbia billboard market, private meetings between COA owners and city officials, and open hostility expressed towards Omni by city officials. Representatives of both Omni and COA met with Columbia administrators and attended meetings of the Columbia City Council, presenting their views concerning provisions of the billboard ordinances then under consideration.

On March 24, 1982, the City Council passed an ordinance which placed a moratorium on all billboard construction unless the Council expressly consented to construction, effectively blocking Omni from entering the market. A state court declared that ordinance unconstitutional. The Council passed a new ordinance on September 22, 1982, which favored COA's dominant position in the Columbia market and restricted Omni's ability to compete.

Omni, at trial and on this appeal, complained that the ordinances injured it and benefited COA by preventing Omni from constructing billboards in areas where COA already had boards. Omni alleged that COA and officials of the City of Columbia brought about passage of the ordinance in furtherance of a conspiracy to "restrain, hinder and suppress competition" between Omni and COA in the marketing of off-premises outdoor advertising space in interstate commerce. Omni also alleged that the defendants conspired to maintain a monopoly in the relevant market area to the detriment of competition, and that the City and COA did monopolize.

The district court granted the City judgment notwithstanding the verdict on the ground that the City was entitled to immunity from Sherman Act liability as established for states by the Supreme Court's decision in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) and applied to municipalities by *Parker*'s progeny, *e.g., Community Communications Co. v. City of Boulder*, 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); *Town of Hallie v. City of Eau Claire*, 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985).

Omni, on appeal, contends that the City is not entitled to *Parker* immunity because South Carolina's authorization for the City's billboard regulation did not extend to utilizing such regulation for anticompetitive purposes. Omni contends alternatively that the City is not entitled to *Parker* immunity because it was not acting pursuant to statutory purpose (*i.e.*, for the public good) but solely in conspiracy with COA to

---

**1.** The relevant geographical market is Richland and Lexington Counties, South Carolina, including Columbia, South Carolina. It is referred to herein as the Columbia market.

drive Omni out of the billboard business and thereby restrain competition in the industry. The City, of course, disagrees with both of Omni's contentions. It argues that it is protected by *Parker*'s "state action" exemption, that there is no "conspirator" exception to *Parker* immunity, and that even if there were, the evidence in this case was not sufficient to have submitted that issue to the jury.

I

## State Action Immunity
### *Parker v. Brown*

In *Parker,* the Supreme Court found California's anticompetitive agricultural marketing program immune from scrutiny under the Sherman Act, holding that Congress did not intend to include official state actions in the Sherman Act's prohibitory ambit. *Parker,* 317 U.S. at 350–52, 63 S.Ct. at 313–14. In subsequent decisions, however, the Court concluded that municipal action was not necessarily the equivalent of state action for the purposes of the *Parker* doctrine and developed criteria for determining when municipalities come under the doctrine's protective umbrella. *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978), *Community Communications Co. v. City of Boulder,* 455 U.S. 40, 102 S.Ct. 835, 70 L.Ed.2d 810 (1982); and *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). *See generally Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976); *California Retail Liquor Dealers Ass'n v. Midcal Aluminum,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980).

The rules governing the initial determination of whether a municipality was engaged in state actions for *Parker* purposes have crystallized in *Town of Hallie.* There, the Supreme Court held that the defendant City of Eau Claire was protected by the *Parker* doctrine because its conduct was adequately authorized by state policy even though the state did not actively supervise implementation of the policy. The plaintiff town alleged that the city used its

monopoly over sewage treatment to gain an additional unlawful monopoly over sewage collection and transportation services in adjacent unincorporated towns. Wisconsin statutes granted authority to cities to construct, add to, alter, and repair sewage systems, and this authority included the power to "describe with reasonable particularity the district to be [served]." 471 U.S. at 41, 105 S.Ct. at 1717. The statutes, moreover, granted cities governing public utilities the right to fix by ordinance "the limits of such service in unincorporated areas" and stated that these municipal utilities "shall have no obligation to serve beyond the area so delineated." *Id.* These authorizations to regulate, the Court concluded, were sufficient to satisfy the clear articulation requirement of the state action test. *Id.* at 44, 105 S.Ct. at 1719.

The Supreme Court said:

Municipalities ... are not beyond the reach of the antitrust laws by virtue of their status because they are not themselves sovereign. Rather, to obtain exemption, municipalities must demonstrate that their anticompetitive activities were authorized by the State pursuant to state policy to displace competition with regulation or monopoly public service. [T]he municipality need not be able to point to a specific, detailed legislative authorization in order to assert a successful Parker defense to an antitrust suit. Rather, ... it would be sufficient to obtain Parker immunity for a municipality to show that it acted pursuant to a clearly articulated and affirmatively expressed state policy....

*Id.* at 38–39, 105 S.Ct. at 1716–17 (citations and internal quotes and ellipses omitted).

To avail itself of the *Parker* exemption then, a municipality must show only that it is adhering to a state policy to replace competition with regulation. It need not demonstrate that it acts under legislative compulsion or that the state actively supervises the involved activity. Neither need it show that the state expressly authorizes it to engage in anticompetitive conduct so long as anticompetitive effects are a foreseeable result of the authorized actions. *Id.* 741 U.S. at 43–47, 105 S.Ct. at 1718–20.

■ We look therefore to the authorizing South Carolina statutes to determine if the City regulated billboards pursuant to a "clearly articulated and affirmatively expressed state policy" which "clearly contemplate[s]" that the City may effect anticompetitive conduct, and conclude that *Town of Hallie*'s requirements are satisfied. South Carolina's expression of policy regarding the City's object of regulation is less focused and not as clearly articulated as that in *Town of Hallie*, but more so than that in the Home Rule Amendment in *Boulder*. The only such statutes effective at the time of the City's actions were the general zoning statutes, which did not refer specifically to billboards but did include regulation of buildings and structures within their ambit.[2] Billboards are, of course, a common feature of urban life, and we think it a proper assumption that the South Carolina legislature envisioned their regulation as a "structure" and as a "use of land." Proceeding from that assumption, our analysis leads us to conclude that the statutory language discussing the grant of power and setting out its purposes is evidence of the requisite legislative policy to authorize municipalities freely to regulate the billboard industry in their area. *Cf. Pendleton Constr. Corp. v. Rockbridge County*, 652 F.Supp. 312 (W.D.Va.1987), *aff'd on its reasoning*, 837 F.2d 178 (4th Cir.1988); *Racetrac Petroleum, Inc. v. Prince George's County*, 601 F.Supp. 892, 906–10 (D.Md.1985), *aff'd*, 786 F.2d 202, 318 (4th Cir.1986).

The second prong of the *Town of Hallie* test requires that the policy "clearly contemplate" that the City may effect anticompetitive conduct. We dealt leniently with the question of legislative contemplation of an anticompetitive effect in *Coastal Neuro-Psychiatric Assocs. v. Onslow Memorial Hosp.*, 795 F.2d 340 (4th Cir.1986), which involved local restrictions on hospital staff privileges pursuant to state statute, stating:

> [The] restrictions ... may reduce the supply or variety of medical services to the surrounding community. The North Carolina legislature must have foreseen this anticompetitive consequence and decided that the regulatory benefits conferred by the statute simply outweighed it.

*Id.* at 342. We think that authority to regulate billboards, like authority to regulate hospital staff privileges, makes an anticompetitive effect of regulation substantially foreseeable and conclude that the second prong is satisfied. That, however, is not the end of our inquiry.

## II

### Denial of Immunity to Municipalities By Conspiracy Exception to *Parker*

Although we conclude that the authorization granted by the State of South Carolina

---

2. S.C.Code Ann. § 5–23–10 (Law Co-op.1976).
   **Building and zoning regulations authorized.**
   For the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of cities and incorporated towns may by ordinance regulate and restrict the height, number of stories and size of buildings and other structures....
   § 5–23–20. **Division of municipality into districts.**
   For any or all of such purposes the local legislative body may divide the municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this article. Within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land....
   § 6–7–710. **Grant of power for zoning.**
   For the purposes of guiding development in accordance with existing and future needs and in order to protect, promote and improve the public health, safety, morals, convenience, order, appearance, prosperity, and general welfare, the governing authorities of municipalities and counties may, in accordance with the conditions and procedures specified in this chapter, regulate the location, height, bulk, number of stories and size of buildings and other structures.... The regulations shall be made in accordance with the comprehensive plan for the jurisdiction as described in this chapter and shall be designed to lessen congestion in the streets; to secure safety from fire, panic, and other dangers, to promote the public health and the general welfare, to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to protect scenic areas; to facilitate the adequate provision of transportation, water, sewerage, schools, parks, and other public requirements....

to its municipalities to regulate the billboard industry normally would be sufficient to clothe the municipalities with *Parker* immunity in exercising that authority, we agree with Omni's contention that the *Parker* exemption is unavailable here. Implicit in the jury verdict was a finding that the City was not acting pursuant to the direction or purposes of the South Carolina statutes but conspired solely to further COA's commercial purposes to the detriment of competition in the billboard industry.

In *Parker*, the Supreme Court enunciated its oft-quoted dictum, "[W]e have no question [in this case] of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade." 317 U.S. at 351–52, 63 S.Ct. at 313–14. With specific reference to the facts of *Parker*, the Court stated:

> The state in adopting and enforcing the ... program made no contract or agreement and entered into no conspiracy in restraint of trade or to establish monopoly but, as sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit.

*Id.* at 352, 63 S.Ct. at 314.

In *Westborough Mall, Inc. v. City of Cape Girardeau*, 693 F.2d 733 (8th Cir. 1982), *cert. denied*, 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983), and *Whitworth v. Perkins*, 559 F.2d 378 (5th Cir. 1977), *vacated*, 435 U.S. 992, 98 S.Ct. 1642, 56 L.Ed.2d 81, *aff'd on rehearing*, 576 F.2d 696 (1978), the courts concluded that *Parker* immunity was unavailable to municipalities that acted solely to further the anticompetitive commercial purposes of private parties. In *Girardeau*, the court said:

> We also disagree with the district court's holding that the state action exemption established in *Parker v. Brown* precludes any liability by the defendants as a matter of law. *Parker* immunity is intended to exempt from the antitrust laws state actions that are anticompetitive in nature. Where a restraint upon trade or monopolization is the result of

valid governmental action no violation of the Sherman Act can be made out. The *Parker* doctrine applies to municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy. Even if zoning in general can be characterized as state action, a conspiracy to thwart normal zoning procedures and to directly injure the plaintiffs by illegally depriving them of their property is not in furtherance of any clearly articulated state policy.

*Id.* at 746 (citations and internal quotation marks, brackets, and ellipses omitted).

Similarly, in *Whitworth*, the Fifth Circuit said:

> The mere presence of the zoning ordinance does not necessarily insulate the defendants from antitrust liability where, as here, the plaintiff asserts that the enactment of the ordinance was itself a part of the alleged conspiracy to restrain trade.

> . . . .

> Plaintiff clearly alleges that the defendants enacted the ordinance for the precise purpose of excluding him from the liquor business in furtherance of their conspiracy. . . .

> . . . .

> [T]his case appears to fall precisely within a category that the *Parker* Court specifically refrained from dealing with. As the Supreme Court put it, that case involved "no question of the state or its municipality becoming a participant in a private agreement or combination by others for restraint of trade." That is the question here.

> . . . .

> It is not every governmental act that points a path to an antitrust shelter. We reject the facile conclusion that action by any public official automatically confers exemption. In *Asheville Tobacco Board of Trade, Inc. v. FTC*, 4 Cir.1959, 263 F.2d 502, 509, the court stated: "... such action must be state action, not individual action masquerading as state

action. A state can neither authorize individuals to perform acts which violate the antitrust laws nor declare that such action is lawful."

559 F.2d at 379–81 (some citations, internal quotation marks and brackets omitted); *see also Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555 (5th Cir.1984) (en banc), *cert. denied,* 474 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986). *But see Boone v. Redevelopment Agency of City of San Jose,* 841 F.2d 886 (9th Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988).

In view of the overriding economic thrust of Sherman Act concerns, it is tempting to consider all political activity as beyond the Act's purpose or reach. Certainly, Congress did not contemplate imposing economic oversight of political abuses *per se.* Yet the language of the Sherman Act is broad enough to include the proscription of actions where politicians or political entities are involved as conspirators. Moreover, we are constrained by established interpretation from excluding from Sherman Act consideration all conspiracies which have some political coloration. If it were otherwise, the Supreme Court in post-*Parker* decisions would have given municipalities the same blanket protection it had awarded states in *Parker.* Even so, we must be very careful in these cases to assure that any political abuse has so completely metamorphosed into an economic abuse that it properly can be regulated by application of Sherman Act legal-economic procedures. In view of the jury verdict, we think that is what is involved here.

We do not have mere allegations of economic improprieties. We deal with a jury verdict which established the alleged improper acts. So viewed, the City's actions must be scrutinized under Sherman Act principles. Clearly this would not preclude permissible and even desirable private meetings by concerned private persons with legislators and public administrators. *See Eastern R.R. Presidents Conference v. Noerr Motor Freight,* 365 U.S. 127, 137–41, 81 S.Ct. 523, 529–30, 5 L.Ed.2d 464 (1961); *California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 510–11,

92 S.Ct. 609, 611–12, 30 L.Ed.2d 642 (1972). What is not permissible in the *Parker* immunity context, however, is that such private contacts and agreements relate not to the purpose of attaining governmental action but solely to forcing competitors from a particular market. We must assume that is what the jury found in this case.

### III

#### Evidence Concerning Conspiracy

■ The City argues, however, that there was not sufficient evidence of a conspiracy to have submitted that question to a jury. The evidence, viewed with appropriate deference to the jury verdict, reflects the following pattern and sequence of events.

COA was half-owned by J. Willis Cantey from 1947 to 1974 and has been fully owned by the Cantey family since 1974. James W. Cantey, Jr., is chief executive officer. J. Willis Cantey was a life-long personal friend of Columbia's mayor, Kirkman Finlay. The Cantey family always had an excellent relationship with Mayor Finlay and the City Council, all four of whom were very good friends of the Canteys. Mayor Finlay viewed his friendship with Cantey as a political asset.

J. Willis Cantey apparently viewed his friendship with the Mayor and councilmen as a business asset. In December 1980, he wrote to Robert O. Naegele, another outdoor advertising merchant who wanted to purchase COA and who had suggested that COA upgrade its plant and seek certain ordinances:

> The Mayor of Columbia and the four councilmen are very good friends of ours. I discussed your suggestion with the Mayor about reworking our existing sign ordinances and he promptly said, "no problem". My son Jim has begun a study to determine exactly what restrictive measures we should request.

Cantey testified that he sought these assurances from the Mayor regarding the desired ordinances in order to keep Naegele out of Columbia.

In January 1982, after Omni had entered the market, J. Willis Cantey again discussed billboards and ordinances with the Mayor. Then, on February 10, 1982, James W. Cantey, Jr., wrote to William Dooner, Omni's owner:

Saturday night my father and mother had dinner with the Mayor of Columbia and his wife. They are life long friends and the Mayor expressed concern as to the increasing number of billboards in the Columbia area. We have always had an excellent relationship with the Mayor and Council and he was speaking off the record. It has always been our policy to be civic minded but low key trying to prevent any public opposition to our business. At some point, I think City Council will be forced to place some type of stringent restrictions on our industry.

The City began the process of formulating a comprehensive ordinance. In the meantime, it moved quickly to enact a moratorium that would remain in effect until the comprehensive ordinance was enacted. On March 10, 1982, an ordinance first drafted earlier that day was given its first reading and was passed by the Council. It banned construction of new billboards in certain specified downtown areas without the express prior permission of City Council. On the previous day, March 9, COA had obtained permits for billboards in locations covered by the March 10 ordinance. The City Manager testified that it was unusual to adopt an ordinance prior to having the City Attorney draft it, and admitted that the Council's action was a "drastic step."

On March 23, a meeting was scheduled between the Mayor and J. Willis Cantey. The meeting was apparently arranged at the last minute, as it was handwritten in the Mayor's handwriting on the Mayor's otherwise-typewritten schedule. On the following day, March 24, the date of the second reading of the ordinance, the City Council altered the amendment of Columbia's Off Premises Commercial Advertising ordinance, with the result that it restricted competition by banning construction of billboards *anywhere* in the city without the Council's express consent. That provision froze the status quo, COA's dominant position in the market. After March 10 but before March 24, COA had obtained billboard permits for locations that would be included in the March 24 ban. COA contends these merely represented prudent preemptive steps. Omni argues that these actions, like those that preceded the March 10 enactment, permit an inference either of advance knowledge or of confidence that the City would act to close the door once COA had topped off its needs.

In any event, the evidence presented to the jury was probative to some degree on the issue of conspiracy. The Council passed the moratorium despite the City Attorney's earlier advice that it was unconstitutional. When Omni brought suit in state court to nullify the ordinance, the Council instructed the City Attorney to defend the suit and effect delay until a new ordinance could be enacted. On June 22, 1982, that action was heard in state court. On July 14 the Council requested that the City Manager prepare a new ordinance as quickly as possible. A preliminary version, which was reviewed by the Mayor, was prepared on July 20. In the meantime, on July 21, having received word that the state court was going to rule against the city, the Council gave first reading to a stopgap ordinance that simply banned new billboards. It would have had the effect of terminating Omni's efforts to obtain sites and erect billboards. The ordinance was not approved on second reading. On July 23, the state court declared the original March 24 ordinance unconstitutional.

The new billboard control ordinance prepared by the City Manager evolved over time. The final version was introduced on September 8, 1982 and finally enacted on September 22. It provided, *inter alia*, for a minimum spacing of 1,000 feet between billboards on the same side of a street and 500 feet between billboards on opposite sides of a street.[3] The effect of this provi-

---

**3.** The ordinance is unartfully drafted; its language requires a minimum spacing of 1,000 feet

generally. That is inconsistent with other evi-

sion, given the existing COA billboards, was to block Omni from large areas of the city.

Before the new ordinance was introduced and enacted, COA submitted a proposed ordinance to the city that specified size of billboards and same-side-of-the street and opposite-side-of-the street distances between billboards in different areas of the city. The first draft of the ordinance prepared by the City tracked these provisions exactly. It and subsequent early versions of the new ordinance provided for 750–foot spacing in some areas of the City. Earlier, on October 5, 1981, in a conversation intended to convince Omni to stay out of Columbia, J. Willis Cantey had asked Omni's Dooner, "Do you think I should talk to my good friend, the Mayor, and get 1,000 foot spacing?" In a March 17, 1982, meeting between Omni, COA, and a representative of the City, the City representative had suggested 750–foot spacing. At one point during that meeting, J. Willis Cantey, irate and upset, stated that he wanted 1,000–foot spacing and was going to get it from the City Council. In the final version, the 750–foot spacing became 1,000 feet.

Cantey Heath of COA, while denying that he expected any favors, testified that COA gave free advertisement to politicians. With reference to one politician at the state level, Heath testified that, having made a friend by providing free billboard space, he would remind that friend of the free advertisement when asking him for help; with reference to another, he testified that discounted advertising rates were provided with the expectation of receiving favors in return.

COA had given the Mayor six free billboards during his first race for mayor in 1978. At trial, immediately after J. Willis Cantey had denied knowledge of those

gifts to the Mayor, he was asked about billing some politicians more than the standard rates:

Q. That's not very fair, charging one [not necessarily the Mayor] nothing and other ones more than your rate card; is it?

. . . .

A. May be he did [COA] a favor so [COA] compensated by giving him a free board. I don't know if that happened.

Councilman Bennett, who had been appointed by the Mayor to a two-man subcommittee to deal with the billboard ordinance, and Councilman Ouzts, a friend of the Cantey family, received inexpensive billboard space during their races in 1983 and February 1984, respectively.[4]

Most of this evidence is uncontradicted, but COA and the City vigorously dispute whether permissible inferences of anticompetitive conduct can be drawn from it. COA and the City, of course, introduced evidence advancing neutral noncompetitive reasons for each of these events. Their problem on appeal, however, is that the jury heard all of the evidence and was required to examine the evidence in its entirety, discarding whatever testimony it considered unreliable and giving weight to all it considered credible. In that important context, and when viewed in the light most favorable to Omni, the evidence tends "to exclude the possibility" that the City and COA acted independently. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Rather, it tends to prove that the City and COA "had a conscious commitment to a common scheme" designed to stifle competition and preserve COA's monopoly. *See Monsanto Co. v. Spray–Rite Serv. Corp.*, 465 U.S. 752, 764, 104 S.Ct. 1464, 1470, 79 L.Ed.2d

dence and would render the 500–foot provision senseless.

**4.** These boards were provided after the Council passed the restrictive billboard ordinance, which the jury found furthered the conspiracy. All parties spent considerable time, both below and on appeal, arguing the relativeness of this evidence. It is, of course, after the fact and at

best had minimal probative effect. At best, when considered with COA's established practice of sometimes exchanging billboards for favors, the jury could have considered the evidence of billboard gifts in 1983 and 1984 as evidence of COA's continuing way of doing business.

775 (1984); *see also Affiliated Capital Corp. v. City of Houston,* 735 F.2d 1555, 1562 (5th Cir.1984) (en banc), *cert. denied,* 474 U.S. 1053, 106 S.Ct. 788, 88 L.Ed.2d 766 (1986). We conclude, therefore, that sufficient evidence supports the jury's finding that there was a conspiracy between the City and COA in violation of sections 1 and 2 of the Sherman Act, and therefore that the City, participating in the conspiracy solely for the purposes of restraint of trade and monopolization, was deprived of the *Parker* immunity to which it would have been entitled except for its involvement in the conspiracy.

## IV

### Immunity of City from Damages Remedy Local Government Antitrust Act

■ Although we reverse the grant of judgment notwithstanding the verdict to the City, we agree in effect with the district court's holding that the Local Government Antitrust Act (LGAA), 15 U.S.C. §§ 34–36, shields the City from a damages award, and that the relief against it is restricted to injunctive relief even though this case was commenced before September 24, 1984, the effective date of the Act.

The Act provides:

**(a) Prohibition in general**

No damages, interest on damages, costs, or attorney's fees may be recovered ... from any local government, or official or employee thereof acting in an official capacity.

**(b) Preconditions for attachment of prohibition; prima facie evidence for nonapplication of prohibition**

Subsection (a) of this section shall not apply to cases commenced before the effective date of this Act [September 24, 1984] unless the defendant establishes and the court determines, in light of all the circumstances, including the stage of litigation and the availability of alternative relief under the Clayton Act, that it would be inequitable not to apply this subsection to a pending case. In consideration of this section, existence of a jury verdict, district court judgment, or any

stage of litigation subsequent thereto, shall be deemed to be prima facie evidence that subsection (a) of this section shall not apply.

15 U.S.C. § 35.

We think the district court could have properly considered at least the following factors: that Omni prevailing would be entitled to effective relief against the City by enjoining it from future Sherman Act violations relating to Omni; that Omni could (and subsequently did) receive a substantial damages award against COA; and that, while the jury might find that the conduct of the City officials amounted to a proscribed conspiracy, the egregiousness of the conduct was a matter the trial court could weigh. *See Kaplan v. Clear Lake City Water Auth.,* 794 F.2d 1059, 1063 (5th Cir.1986); *S. Kane & Son, Inc. v. W.R. Grace & Co.,* 623 F.Supp. 162, 163 (E.D.Pa. 1985), *aff'd,* 857 F.2d 1464 (3d Cir.1988); and *Huron Valley Hosp. v. City of Pontiac,* 612 F.Supp. 654, 664–65 (E.D.Mich. 1985), *aff'd in part, appeal dismissed in part,* 792 F.2d 563 (6th Cir.), *cert. denied,* 479 U.S. 885, 107 S.Ct. 278, 93 L.Ed.2d 254 (1986). We therefore find no abuse of discretion in the district court's ruling that the City is immune to damages under the LGAA.

It follows from the verdict of liability that the City was subject to an appropriate injunctive judgment. We are not inclined as a reviewing court to fashion the provisions of an injunction as requested by Omni, but, after remand and hearing, the district court should grant Omni an appropriate injunction against the City.

## V

### Private Citizens Immunity Under *Noerr/Pennington* Doctrine

The district court grounded the judgment notwithstanding the verdict to COA on its perception that its actions were immunized from Sherman Act liability because they were in essence no more than those of a private entity petitioning its local government, and that such action was shielded from Sherman Act liability under the doc-

trine established by the Supreme Court in *Eastern R.R. Pres. Conf. v. Noerr Motor Freight,* 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *UMWA v. Pennington,* 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965); and *California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Omni argues that the facts of this case as found by the jury bar COA from the immunity established in *Noerr* and expanded in *Pennington* and *California Motor.* Its argument is dually grounded on exceptions to *Noerr/Pennington* immunity that it identifies as the "sham" exception and the "co-conspirator" exception. COA counters (1) that under the proven facts COA's actions cannot be interpreted as coming within the "sham" exception, and (2) that as a matter of law there is no co-conspirator exception to *Noerr/Pennington* immunity.

■ We first consider Omni's contention that *Noerr/Pennington* immunity is unavailable to COA because its actions before the Council and zoning administrators of the City of Columbia were a "sham." In *Noerr,* the Supreme Court explained:

> [T]here may be situations in which a publicity campaign, ostensibly directed towards influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified.

365 U.S. at 144, 81 S.Ct. at 533. In *California Motor,* the Court held that no immunity attaches where a defendant's petitioning is used, not to influence the governmental agency, but "to harass and deter [competitors] from having a free and unlimited access to administrative and judicial proceedings so as to deny them access to the tribunals." 404 U.S. at 515, 92 S.Ct. at 614 (quoting complaint). More recently, in *Allied Tube & Conduit v. Indian Head, Inc.,* 486 U.S. 492, 108 S.Ct. 1931, 1937 n. 4, 100 L.Ed.2d 497 (1988), the Supreme Court cited *Noerr* and reiterated:

> Of course, in whatever forum, private action that is not genuinely aimed at procuring favorable government action is

a mere sham that cannot be deemed a valid effort to influence government action.

In *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 691 F.2d 678, 687 (4th Cir.1982), this court said:

> Actions taken to discourage and ultimately prevent competitors from meaningful access to the processes of administrative agencies fall within the sham exception to *Noerr–Pennington* immunity. *California Motor Transport Co. v. Trucking Unlimited,* 404 U.S. 508, 512–513, 92 S.Ct. 609, 612–613, 30 L.Ed.2d 642 (1972). Thus, proof that appellants conspired to bring the chairman of the Central Planning Council and an assistant attorney general into their conspiracy, with the intent to foreclose HBC from meaningful access to the Central Planning Council and the MCC, is within the sham exception to *Noerr–Pennington....* We believe that appellants are not immune from antitrust liability if the proof establishes they were engaged in a baseless appeal to the Superior Court of Wake County with intent to delay approval of HBC's application for a certificate of need and thereby delay its entrance into the Raleigh market.

*See also Pendleton Constr. Corp. v. Rockbridge County,* 652 F.Supp. 312, 319 (W.D. Va.1987).

COA argues that regardless of its ultimate desire to foreclose Omni from the Columbia market, its invocation of the political process to obtain a billboard spacing ordinance could not have been a "sham" as that term is defined in the controlling decisions. In the first place, we doubt if the evidence in this case supports this COA assertion. Properly construed, the evidence reflects that COA had operated in the Columbia market for some forty years under existing ordinances and had not sought substantial changes until it was threatened with competition. The changes it sought obviously inured to COA's position in its contest with the incoming competition. Construed from that perspective, the facts support a jury conclusion that

COA's interaction with the mayor, City administrators, and members of the Council "was actually nothing more than an attempt to interfere directly with the business relations of a competitor" or an attempt to harass and deter Omni. Likewise, the jury could have properly found to exist the kind of circumstances we described in *Hospital Building Co.*—finding that COA's purposes were to delay Omni's entry into the market and even to deny it a meaningful access to the appropriate city administrative and legislative fora. The evidence, for example, supports inferences that COA instigated the Council's enactment of an unconstitutional ordinance even though the city attorney had advised of its probable unconstitutionality, and that COA encouraged the City's later instruction to its attorney to proceed with litigation to stall until a moratorium could be enacted. Although it is true, as COA contends, that Omni representatives met with City zoning officials and appeared before Council, the jury could well have believed that this was not truly meaningful access but merely a *pro forma* recognition of proponent views that had already been precluded by the conspiracy.

The court instructed the jury:

We may assume that persons seeking political action do so to further their own interests. There is nothing illegal about this even when one seeks action which is intended by that person to be in that person's own advantage.

. . . .

So, if by the evidence you find that that person involved in this case procured and brought about the passage of ordinances solely for the purpose of hindering, delaying or otherwise interfering with the access of the Plaintiff to the marketing area involved in this case ... and thereby conspired, then, of course, their conduct would not be excused under the antitrust laws.

So once again an entity may engage in a legitimate lobying [sic] committee to procure legislative [sic] even if the mo-

tive behind the lobbying is anticompetitive.

If you find Defendants conspired together with the intent to foreclose the Plaintiff from meaningful access to a legitimate decision making process with regard to the ordinances in question, then your verdict would be for the Plaintiff on that issue.

In our view, the jury verdict, in light of the instructions it received from the court, necessarily reflected its finding that COA's actions were a "sham" and, construing the evidence with appropriate deference to the verdict, it supports that finding. In view of this holding, it is not necessary to consider the issue of whether there is a co-conspirator exception to *Noerr–Pennington* immunity.

## VI

### Relevant Product Market

■ COA next argues that even if we rule in favor of Omni on the *Parker* and *Noerr–Pennington* issues, it is entitled to a new trial because the trial court erroneously directed the jury to return a verdict in favor of Omni on its definition of the relevant product market. COA correctly contends that in order to sustain its Sherman Act claims, Omni was required by a preponderance of the evidence to prove the relevant market claimed to be affected. *See Satellite Television & Associated Resources v. Continental Cablevision*, 714 F.2d 351, 355 (4th Cir.1983), *cert. denied*, 465 U.S. 1027, 104 S.Ct. 1285, 79 L.Ed.2d 688 (1984). COA forcefully urges that the court erred in instructing that the involved product market was the outdoor advertising industry. It contends that not only did Omni fail to satisfy its burden of proving that outdoor advertising was the relevant product market but that there was evidence that the market included newspapers, television, and radio. It urges that the resolution of the product market issue was for the jury.

■ COA relies on the testimony of its chief executive officer, James Cantey, Jr., and its employee Clary, together with the

testimony elicited on cross-examination of Omni's president and vice-president. The sum of that testimony was that all of the media competed for the advertising dollar in the relevant geographical market. However, Dooner, Omni's owner, while agreeing that outdoor advertising competed generally with other media for the advertising dollar, testified that they were separate markets. He explained that advertisers devise campaigns using different media and might employ, for example, television, radio, and billboards in the same campaign. Dooner characterized television, radio, newspapers, and magazines as "indoor" media and billboards as "outdoor" media, pointing out that advertisers commonly allocate funds for each.[5]

Seminal Supreme Court cases instructing us how to define a relevant product market include *United States v. Grinnell Corp.*, 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); *Brown Shoe Co. v. United States*, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962); *United States v. E.I. du Pont de Nemours & Co.*, 353 U.S. 586, 77 S.Ct. 872, 1 L.Ed.2d 1057 (1957); and *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The Court has effected some sequential modifications of the holdings in these cases, and rules have emerged governing the definition of relevant product market. The Court in *Brown Shoe* stated:

> The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.

370 U.S. at 325, 82 S.Ct. at 1523–24 (citing *du Pont*, 353 U.S. 586, 77 S.Ct. 872). It went on to introduce the rules defining submarkets. In determining the relevant product market in the Columbia area, however, we need judge only the reasonable interchangeability and cross-elasticity of demand between outdoor advertising, on the one hand, and television, newspapers, and radio, on the other.[6]

■ The district court instructed the jury that the outdoor advertising industry was the relevant product market—in effect directing a verdict on that issue. That makes more difficult the resolution of the question of whether Omni satisfied its burden of identifying the relevant product market. In reviewing a directed verdict, we consider the decision *de novo*. *Gairola v. Virginia Dep't of General Servs.*, 753 F.2d 1281, 1285 (4th Cir.1985). Without weighing the evidence or considering the credibility of the witnesses, we must be convinced that "there can be but one conclusion as to the verdict that reasonable jurors could have reached." *Wheatley v. Gladden*, 660 F.2d 1024, 1027 (4th Cir. 1981). Viewing the procedural and factual calculus in its totality, however, we are persuaded that the district court was correct in its instruction to the jury concerning the relevant market.

COA offered sparse evidence that there was general competition between all types of media advertising. Dooner testified, in effect, that in evaluating competition for obtaining advertising contracts, other media were not substitutable for outdoor advertising. Other evidence in the record indicates that advertisers in the Columbia area using billboards did so because they could reach narrowly targeted areas and

---

5. He testified in relevant part:
   Q. Why are they not the same type of competitor?
   A. Well, in the first place in an advertising campaign an advertiser will make a decision to have several media. He may very well suggest television, radio. If it is a car dealer he may use both, they will also use billboards as a companion in advertising.
   In other words, the easiest way to explain it is one is an indoor media; television, radio, newspaper, magazines. The other is outdoor. It is not uncommon to have an advertiser have a budget allocated so much for outdoor advertising, so much for radio, so much for television, others.

6. We decide that the outdoor advertising industry in Columbia is an appropriate product market under the *du Pont* test. We would have arrived at the same result under *Brown Shoe*'s submarket concept, *i.e.*, the "practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." 370 U.S. at 325, 82 S.Ct. at 1324.

that their messages had specific and enduring attributes. COA offered no evidence concerning substitutability, cross-elasticity, or other facts which might be relevant to product market determination other than the bald statements concerning general competition. In *du Pont,* the Court stated:

> Determination of the competitive market for commodities depends on how different from one another are the offered commodities in character or use, how far buyers will go to substitute one commodity for another.

. . . .

> In considering what is the relevant market for determining the control of price and competition, no more definite rule can be declared than that commodities reasonably interchangeable by consumers for the same purposes make up that "part of the trade or commerce," monopolization of which may be illegal.

351 U.S. at 393–95, 76 S.Ct. at 1006–08. Cross-elasticity of demand has been defined as:

> [T]he percentage change in the quantity demanded of a product resulting from a small percentage change in the price of the product.

. . . .

> The higher the cross-elasticity of demand between two products, the less will be the ability of a sole seller of one of the products to raise his price without suffering a reduction in sales volume so great as to offset the positive effect of the higher on profits.

R.A. Posner, Antitrust 437, 438 (1978); *see also* II P. Areeda & D. Turner, Antitrust Law, § 531, at 398–99 (1978).

In *NCAA v. Board of Regents,* 468 U.S. 85, 104 S.Ct. 2948, 82 L.Ed.2d 70 (1984), Justice Stevens, writing for the majority,

approved a district court conclusion that college football broadcasts constituted a separate market of television programming on Saturday afternoon. This was supported, he said, by the district court's finding "that intercollegiate football telecasts generate an audience uniquely attractive to advertisers and that competitors are unable to offer programming that can attract a similar audience," and that "the District Court's subsidiary finding that advertisers will pay a premium price per viewer to reach audiences watching college football because of their demographic characteristics is vivid evidence of the uniqueness of this product." *Id.* at 111, 104 S.Ct. at 2965 (footnotes omitted).

Although the product market discussion in *NCAA* involved the content of programs, we think that reasoning is generally applicable to advertisers' selectivity in choosing billboards, radio, television, or newspapers, singly or in combination. The patterns of competition in selling entertainment do not necessarily follow the patterns controlling competition in other industries because the qualities of specific entertainment that attract different audiences are each unique.[7] So too the economic utility of a particular media for a particular purpose makes statements concerning general competition between them inconclusive as to whether each is a separate product market. We think this is demonstrated in *Times–Picayune Publishing Co. v. United States,* 345 U.S. 594, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). There, the Court, in considering the relevant product market in a newspaper tying case, said:

> For every product, substitutes exist. But a relevant market cannot meaningfully encompass that infinite range. The circle must be drawn narrowly to exclude any other product to which, within reasonable variations in price, only a limited

---

7. We think Professor Areeda's comment in his discussion of the case is significant:
   > Of course, other programming was available at lower cost, although not necessarily at lower cost per viewer attracted by the program. Indeed, with respect to any class of program—baseball, all sports, theatrical films, situation comedies—other programs are available.

Yet, there seems little doubt that a hypothetical monopolist of any significant program class could elevate its price above the level that would prevail under substantial competition within that program class. P. Areeda & H. Hovenkamp, Antitrust Law § 525.1, at 455 (Supp.1988).

1142

number of buyers will turn; in technical terms, products whose "cross-elasticities of demand" are small. Useful to that determination is, among other things, the [newspaper] trade's own characterization of the products involved. The advertising industry and its customers, for example, markedly differentiate between advertising in newspapers and in other mass media.

*Id.* at 612 n. 31, 73 S.Ct. at 882 n. 31 (citations to advertising trade journals omitted).

Our task would have been easier had the district court required the parties to produce detailed evidence concerning factors affecting substitution and cross-elasticity. The only evidence on the record, however, is that billboards in the Columbia area are not substitutable with advertising in other media and that there is little, if any, cross-elasticity of demand. We think this satisfies Omni's burden of proving a relevant market. It is the only relevant record evidence and that, together with the Supreme Court's general expressions in *NCAA* and *Times–Picayune,* persuades us that the district court did not err in directing a verdict on this discrete issue.

## VII

### Injury to Competition

COA next argues that even if the evidence established a relevant product market, Omni's evidence concerned only injury to Omni, and that there was no testimony that competition, rather than just Omni, was injured. COA, however, owned ninety-five percent of the market; no competition existed. The final ordinance not only closed Columbia to Omni, but precluded any future competition against COA. This is a case of retention and solidification of monopoly power by the destruction of the only meaningful competitor. These are circumstances which a jury may properly consider in determining injury to competition. *See Brunswick Corp. v. Pueblo Bowl–O–Mat,* 429 U.S. 477, 489 n. 14, 97 S.Ct. 690, 698 n. 14, 50 L.Ed.2d 701 (1977); *Ratino v. Medical Service,* 718 F.2d 1260, 1272 (4th Cir.1983).

## VIII

### South Carolina Unfair Trade Practices Act

Omni also attacks the district court's grant of judgment notwithstanding the verdict on its state unfair trade practices claim. Section 39–5–20(a) of the Code of South Carolina states:

Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.

Section 39–5–140 provides in part:

(a) Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of an unfair or deceptive method, act or practice declared unlawful by § 39–5–20 may bring an action individually, but not in a representative capacity, to recover actual damages.

The district court instructed the jury that:

A trade practice is unfair when it offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

It went on with a detailed explanation of what constituted such a practice. The jury returned a verdict in favor of Omni on the UTPA count in the amount of $11,000 without trebling. The district court granted COA's motion for judgment notwithstanding the verdict on the UTPA count solely on its application of the rule established in *Noack Enter. v. Country Corner Interiors,* 290 S.C. 475, 351 S.E.2d 347 (1986), *cert. dismissed,* 294 S.C. 235, 363 S.E.2d 688 (1987), to the facts of this case. In *Noack,* the South Carolina Court of Appeals interpreted the Act:

To be actionable under the UTPA, ... the unfair or deceptive act or practice in the conduct of trade or commerce must have an impact upon the public interest. The act is not available to redress a private wrong where the public interest is unaffected.

. . . .

[U]nfair or deceptive acts or practices in the conduct of trade or commerce have an impact upon the public interest if the acts or practices have the potential for repetition.

*Id.* 351 S.E.2d at 350–51. There are no South Carolina cases on the point, but, in our view, a finding of conspiracy to restrain competition is tantamount to a finding that the underlying conduct has "an impact upon the public interest," and the district court erred in entering judgment notwithstanding the jury's verdict. In view of the court's judgment, it, of course, did not make findings concerning whether COA's acts were willful or knowing. Section 39–5–140 of the UTPA provides in part:

If the court finds that the use or employment of the unfair or deceptive method, act or practice was a willful or knowing violation of § 39–5–20, the court shall award three times the actual damages sustained and may provide such other relief as it deems necessary or proper.

On remand, the district court should make the determination required by that section.

## IX

### Damages

■■■ COA, in its cross-appeal, raises three issues relating to damages: first, that damages, if any, were caused only by COA's legitimate business acumen; second, that there was insufficient evidence as to the amount of damages; and, third, that the amounts awarded as remedies for violations of the Sherman Act counts were duplicative and inconsistent.

#### (a) Causality

The Supreme Court discussed the causality standard for market exclusion cases in some detail in *Zenith Radio Corp. v. Hazeltine Research,* 395 U.S. 100, 123–25, 89 S.Ct. 1562, 1576–78, 23 L.Ed.2d 129 (1969) (citing *Bigelow v. RKO Radio Pictures,* 327 U.S. 251, 264, 66 S.Ct. 574, 579, 90 L.Ed. 652 (1946):

[In exclusion-from-a-market cases], in the absence of more precise proof, the factfinder may "conclude as a matter of just and reasonable inference from the proof of defendants' wrongful acts and their tendency to injure plaintiffs' business, and from the evidence of the decline in prices, profits and values, not shown to be attributable to other causes, that defendants' wrongful acts had caused damage to the plaintiffs."

We discussed the necessary causal connection between a defendant's antitrust violation and a plaintiff's damages in *Metrix Warehouse v. Daimler–Benz Aktiengesellschaft,* 828 F.2d 1033 (4th Cir.1987), *cert. denied,* 486 U.S. 1017, 108 S.Ct. 1753, 100 L.Ed.2d 215 (1988):

[T]he antitrust plaintiff must demonstrate a causal connection between the defendant's *violation* and the damages claimed. . . . "An antitrust plaintiff is entitled to recover only for that portion of its losses caused by the defendants' unlawful conduct."

*Id.* at 1043–44 (quoting *Allegheny Pepsi-Cola Bottling Co. v. Mid–Atlantic Coca-Cola Bottling Co.,* 690 F.2d 411, 415 (4th Cir.1982)) (internal citations omitted).

In the present case, Omni claims that its losses were caused by the ordinances which prevented it from erecting billboards in necessary locations and from selling "packages" of billboards that were required by national advertisers. COA, on the other hand, insists that Omni's losses were caused by legitimate business competition from COA. Dooner testified that all of Omni's losses were caused by anticompetitive conduct. Again, Omni's evidence was not a model for properly proving a factual issue. COA was equally deficient, offering no evidence regarding how much, if any, of Omni's losses was caused by any lawful COA conduct.

An antitrust plaintiff, of course, like any other plaintiff, has the burden of proving damages. The satisfaction *vel non* of its burden, however, is measured under a lenient standard of proof:

[T]he plaintiff may prove the extent of damages under a relaxed standard of

proof ... because estimates of the extent of damage depend on reasonable projections of the position of the plaintiff's business in the absence of the antitrust violation.

*Barber & Ross Co. v. Lifetime Doors,* 810 F.2d 1276, 1281 (4th Cir.) (citations omitted), *cert. denied,* 484 U.S. 823, 108 S.Ct. 86, 98 L.Ed.2d 48 (1987). As we explained in *Metrix:*

> [A] reasonable amount of uncertainty and lack of precision is tolerable because "damage issues in [antitrust] cases are rarely susceptible of the kind of concrete, detailed proof of injury which is available in other contexts." Moreover, a wrongdoing defendant should not profit at the expense of his victim where it is his own anticompetitive conduct that precludes direct and specific proof of damage.

828 F.2d at 1043 (quoting *Zenith,* 395 U.S. at 123, 89 S.Ct. at 1577). We observed that "[t]his rationale takes on special force in market foreclosure cases because probable and inferential proof is often all that is available to hypothesize lost profits." *Id.* at 1043 n. 20. We concluded:

> [W]hen the violation has been proven, "the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances 'juries are allowed to act on probable and inferential, as well as upon direct and positive proof.'"

*Id.* at 1043 (quoting *Bigelow,* 327 U.S. at 264, 66 S.Ct. at 580, and *Story Parchment Co. v. Paterson Paper Co.,* 282 U.S. 555, 564, 51 S.Ct. 248, 251, 75 L.Ed. 544 (1931)).

We think Omni adequately carried its initial evidentiary burden. When COA claimed that Omni's decline in profits and values was attributable to causes other than COA's anticompetitive activities, the burden was on COA to offer that evidence, which was primarily in its possession.[8] *See id.* at 1044–45; *Knutson v. Daily Review,* 548 F.2d 795, 811 (9th Cir.1976), *cert. de-*

*nied,* 433 U.S. 910, 97 S.Ct. 2977, 53 L.Ed.2d 1094 (1977), *reaff'd, Northwest Publications v. Crumb,* 752 F.2d 473, 477 (9th Cir.1985); *Farley Transp. v. Sante Fe Trail Transp. Co.,* 786 F.2d 1342, 1352 (9th Cir.1985). We agree with the Eighth Circuit's reasoning that the inseparability of causes created by a wrongdoer should not redound against the victim:

> [T]he fact that the ... illegal conspiracy was composed of lawful and unlawful conduct so tightly intertwined as to make it difficult to determine which portion of the damages claimed were caused by the unlawful conduct should not diminish the recovery. Similarly, the Court should recognize that the harmful consequences of certain unlawful conduct may have been exacerbated by otherwise lawful conduct. In such a situation, the fact that lawful conduct contributed to additional injury should not prohibit recovery for that injury.

*National Farmers' Org. v. Associated Milk Producers,* 850 F.2d 1286, 1307 (8th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1535, 103 L.Ed.2d 840 (1989).

### *(b) Sufficiency of Evidence Supporting Amount of Damages Award*

■ We think the jury verdict, including the amount of damages it awarded, was based on sufficient evidence. William Dooner, from an extensive background in the billboard industry, testified about two kinds of damage: (1) discrepancy between actual and projected income; and (2) decreased value of Omni's physical plant (billboards). The testimony included his reasoning and basis for arriving at lost income and the value of the physical plant.

Dooner, in his testimony, demonstrated Omni's projected sales for the involved period, providing the basis for his projections and calculating projected sales at $1,755,-000. He stated, however, that actual sales amounted to only $585,000—resulting in an income shortfall or loss of $1,111,804. As a basis for his valuation of Omni's plant,

---

8. This is, of course, not so when the "other causes" include factors that are internal to plaintiff or general in the market. *See Eastern Auto Distrib. v. Peugeot Motors,* 795 F.2d 329,

338 (4th Cir.1986); *accord United States Football League v. National Football League,* 842 F.2d 1335, 1378–79 (2d Cir.1988).

Dooner testified that in Atlanta and Austin, Texas, Omni had earlier sold its physical plants for forty times the value of monthly sales. For Columbia, however, he projected the resale value of an ongoing outdoor advertising business as thirty-six times monthly sales (three times annual sales). He explained that his projected sales for 1984 were $819,000 but that COA's unfair practices caused his actual sales for 1984 to total only $585,000. Using that formula, which he described as based on industry practices, Dooner testified that Omni's plant value would have been $2,457,000 (three times projected sales of $819,000) had it not been reduced by the effect of the ordinance. He explained, however, that Omni's actual value was $1,755,000 (three times actual sales of $585,000), leaving a loss of $702,000 in plant value caused by the ordinance's effect. He added the loss in income and plant value to conclude that Omni's entire loss attributable to COA's conduct was $1,813,804. We think this evidence was sufficient to support the jury award of $600,000 on the section 1 violations and $400,000 for the section 2 violations.

### (c) Consistency of Sherman Act Damages Award

The third damages issue raised by COA relates to its contention that the Sherman Act damage award was inconsistent and duplicative. The jury awarded $600,000 on the section 1 claim and $400,000 on the section 2 claim. COA argues that, since both claims were premised on the same alleged conduct and injuries, the awards are inconsistent. We disagree. It is true, of course, that much of the damages suffered by Omni as a result of COA's monopolistic activities would have been incurred even if it had done nothing in restraint of trade. We can conceive of different effects flowing from the two types of activities, however, and think there was sufficient evidence upon which the jury could have awarded separate damages for each violation. COA owned ninety-five percent of the local billboard market when Omni entered the local area. Obviously, Omni could have been, either legally or illegally, damaged by its competitor's monopolistic position. Conceivably, however, even though damaged, it could have survived and perhaps even prospered—if its principal competitive obstacle was solely COA's monopolistic control. The jury could have found additionally that COA's conspiring with governing city officials to restrain competition even beyond its monopolistic position constituted added increments of damages.

Finally, we find no sufficient merit to warrant reversal in the defendants' broadside attack on the district court's instructions.

## X

### Summary

In conclusion, we reverse the district court's grant of judgment notwithstanding the verdict to the City. We agree that it is shielded from a damages award; however, we remand for entry of appropriate injunctive relief.

We also reverse the district court's grant of judgment notwithstanding the verdict to COA and reinstate the jury's award of damages. On remand, the district court should consider Omni's motion for treble damages and attorney fees under the Sherman Act and South Carolina Unfair Trade Practices Act.

REVERSED AND REMANDED.

WILKINS, Circuit Judge, dissenting:

I write not to suggest that the activities of the defendants present a model of good government for civics class instruction. I would affirm the district court simply because the facts do not support a finding of Sherman Act violations.

The majority holds COA liable for its successful lobbying efforts under the "sham" exception to *Noerr–Pennington* immunity. Additionally, the majority holds that the city is not shielded by *Parker* immunity from the federal antitrust laws even though the ordinances passed were pursuant to a clearly articulated state policy to replace competition with regulation.

Because the evidence is not sufficient for a jury to displace either *Noerr–Pennington* immunity, under the sham or co-conspirator exceptions, or *Parker* immunity, under the conspiracy exception, I respectfully dissent.

## I.

According to the record, J. Willis Cantey, the half-owner of COA, and the Mayor of Columbia were personal friends. When Omni expressed its intent to enter the Columbia billboard market, COA became alarmed and Cantey used his personal relationship with the Mayor and other members of the Columbia City Council to secure passage of ordinances designed to substantially foreclose Omni from the Columbia billboard market. Telephone calls and letters from Cantey to Omni revealed that Cantey was confident that he could influence the city officials to pass anticompetitive billboard ordinances. Cantey submitted language for proposed ordinances which the City Council incorporated in the ordinances it enacted. The record showed that a moratorium ordinance was passed quickly despite warnings from the City Attorney that it was unconstitutional. The city instructed the City Attorney to defend a lawsuit challenging the ordinance even though the City Attorney again advised that in his opinion the ordinance was unconstitutional. The timing of the actions and inactions of the city was suspiciously close to the private meetings and telephone calls made by Cantey to the Mayor. And, the record contains evidence which could lead to the conclusion that the Mayor harbored antagonistic feelings toward Omni. Finally, there was evidence that the Mayor and other members of the City Council received in kind political contributions from COA.

From this evidence, one could reasonably conclude that the anticompetitive billboard ordinances were passed in large measure because of Cantey's lobbying efforts and his personal relationship with the Mayor and other members of the City Council. But this is not sufficient to strip the defendants of antitrust immunity.

The majority quotes extensively from the charge given by the district court to the jury. In my view the charge was incomplete due to the general way "conspiracy" was described. No limiting factors, such as evidence of illegal acts like bribery or kickbacks or evidence of a selfish or corrupt motive, were included in the description of the conspiracy exception in order to guide the jury. The jury could have concluded, therefore, that lobbying, which resulted in anticompetitive billboard ordinances and rested primarily on the lobbyist's personal relationship with elected officials, was sufficient evidence upon which to find a "conspiracy." Because of the questionable charge, I attach less faith in the verdict of the jury than does the majority.

However, remand would be inappropriate for the evidence in the record is insufficient to support the verdict even if a more definite charge had been given. At no time did COA employees threaten anyone or use otherwise coercive tactics. No one engaged in deception or misrepresentation to secure passage of the billboard ordinances. There was no evidence of any illegal conduct such as bribery, coercion, violence, kickbacks, or the like. Neither the Mayor nor the City Council members stood to gain any personal financial advantage by passing the billboard ordinances nor was there any evidence of any other selfish or otherwise corrupt motive. Without some evidence of activity such as this, I would affirm the district court and hold that antitrust immunity attached.

## II.

The district court held that COA was immune from antitrust liability under *Noerr–Pennington* immunity. I agree.

In *Noerr*, 365 U.S. 127, 81 S.Ct. 523, the Court stated:

In a representative democracy such as this, these branches of government act on behalf of the people and, to a very large extent, the whole concept of representation depends upon the ability of the people to make their wishes known to their representatives. To hold that the government retains the power to act in

this representative capacity and yet hold, at the same time, that the people cannot freely inform the government of their wishes would impute to the Sherman Act a purpose to regulate, not business activity, but political activity, a purpose which would have no basis whatever in the legislative history of that Act.

*Id.* at 137, 81 S.Ct. at 529. Thus, the Supreme Court has held that lobbying efforts directed at public officials, even if based solely on an anticompetitive motive, are not violative of the federal antitrust laws. *Id.* at 139, 81 S.Ct. at 530. *See also United Mine Workers of America v. Pennington,* 381 U.S. 657, 670, 85 S.Ct. 1585, 1593, 14 L.Ed.2d 626 (1965) (*"Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.").

However, not all efforts ostensibly directed toward influencing governmental action are protected. When the action "is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor [then] the application of the Sherman Act would be justified." *Noerr,* 365 U.S. at 144, 81 S.Ct. at 533. The Supreme Court last applied the sham exception in *California Motor Transport v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). In *California Motor* the defendants abused the governmental process by filing vexatious, serial litigation designed not to win victories in the adjudicatory process, but to harass and delay competitors from entering the California trucking market. The Court ruled that the use of the adjudicatory process in this manner was designed to directly injure the competition, not by way of litigation victories, but by way of the litigation process itself.

In *MCI Communications Corp. v. AT & T Co.,* 708 F.2d 1081 (7th Cir.) *cert. denied,* 464 U.S. 891, 104 S.Ct. 234, 78 L.Ed.2d 226 (1983), the court stated:

Without a doubt, the intention to harm a competitor is *not* sufficient to make litigation or administrative proceedings a sham. That anticompetitive motive is the very matter protected under *Noerr–Pennington.* Rather, the requisite motive for the sham exception is the intent to harm one's competitors not by the *result* of the litigation but by the simple fact of the *institution* of litigation.

*Id.* at 1156 (quoting *City of Gainesville v. Florida Power & Light Co.,* 488 F.Supp. 1258, 1265–66 (S.D.Fla.1980)) (emphasis in original). Therefore, contrary to the view of the majority, the "sham" exception refers to invocation of governmental process not to achieve the legitimate outcome of the process, but as a weapon to directly injure competitors.

The majority relies on language from *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 691 F.2d 678 (4th Cir.1982) (*HBC II*)[1], to define the scope of the sham exception in our circuit. However, *HBC II* is distinguishable for it involved "baseless appeals" of the administrative process "with intent to delay ... entrance into the ... market." *Id.* at 687.

Though not cited by the majority, this circuit has recently refined the breadth of the sham exception in *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 791 F.2d 288 (4th Cir.1986) (*HBC III*). In *HBC III* this court accepted Professor Areeda's explanation of a sham:

[T]he basic concept [of the sham exception], as employed by the Supreme Court, is that the defendant's activity was intended to injure the plaintiff directly *rather than through a governmental decision.* When the antitrust defendant had not truly sought to influence a governmental decision, his invocation of governmental machinery is a sham. To be sure, he would always be pleased to obtain a governmental decision against his rival. But *where he had no reasonable*

---

**1.** Prior proceedings are reported in *Hospital Bldg. Co. v. Trustees of Rex Hosp.,* 511 F.2d 678 (4th Cir.1975), *rev'd,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976) (*HBC I*); 691 F.2d 678 (4th Cir.1982) (*HBC II*); and 791 F.2d 288 (4th Cir.1986) (*HBC III*).

*expectation of obtaining the favorable ruling,* his effort to do so was a sham. *Id.* at 292 (quoting P. Areeda, *Antitrust Law,* ¶ 203.1a (Supp.1982)) (emphasis added). Professor Areeda's definition is not inconsistent with the language of *HBC II* when read in context with the facts of that case.

The lobbying efforts of COA do not meet the definition of a sham as explained in *HBC III.* COA genuinely lobbied for ordinances which, if passed, would substantially foreclose Omni from the Columbia market. Not only did COA expect favorable results from its lobbying efforts, it was in fact successful in obtaining the billboard ordinances it sought. Nor was the injury to Omni inflicted directly by the COA lobbying efforts. Rather, any injury inflicted was by governmental action—the enactment of the billboard ordinances.

### III.

Neither does the co-conspirator exception to *Noerr–Pennington* immunity strip COA of its immunity.

The district court recognized that some courts would find a violation when the anticompetitive lobbying goes beyond "official persuasion" to reach the point of a scheme to restrain trade. *See Duke & Co. v. Foerster,* 521 F.2d 1277, 1282 (3d Cir.1975). Even if one were to follow *Duke* I do not think the activities of COA here went beyond the tenuous line. It is fair to infer from the evidence that Cantey used to his advantage his personal relationship with city officials and persuaded them to pass the anticompetitive billboard ordinances. But if the outcome of lobbying efforts is the passage of objectionable legislation, the proper remedy lies with the political process.

Because I do not think that the term "official persuasion" precisely defines actionable lobbying techniques, I agree with the district court that "official persuasion," as used in *Duke,* is too broad. The district court correctly stated it did not follow the *Duke* opinion because it feared that the general definition of illegal lobbying, beyond "official persuasion," would emascu-

late the *Noerr–Pennington* immunity doctrine. In so ruling, the district court found other authorities more persuasive. Other circuits addressing the co-conspirator exception issue have erected more precise evidentiary hurdles than were articulated by the Third Circuit in *Duke.*

In *Video Int'l Prod. v. Warner–Amex Cable Communications,* 858 F.2d 1075 (5th Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 1955, 104 L.Ed.2d 424 (1989), the court stated:

> Although [the defendant] argues that the [co-conspirator] exception will not apply unless [the defendant] used coercion or bribery to obtain its end, we do not believe the exception is so restricted. At the same time, however, we do find that the cases indicate that the official with whom the petitioner conspires must, at a minimum, have had some selfish or otherwise corrupt motive in siding with the petitioner to result in an illegal conspiracy sufficient to activate the co-conspirator exception.

*Id.* at 1083. Not only is there no evidence of illegal conduct, there is also no evidence of a selfish or otherwise corrupt motive on the part of the Mayor or members of the City Council.

In *Boone v. Redevelopment Agency of San Jose,* 841 F.2d 886 (9th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 489, 102 L.Ed.2d 526 (1988), the court held that private meetings between government officials and a lobbyist proved nothing other than a classic case for application of the *Noerr–Pennington* doctrine. *Id.* at 894–95. The *Boone* court stated that without evidence that the defendant did something "otherwise illegal" its actions fell within the *Noerr–Pennington* immunity. *Id.* at 895. Likewise, in *Westborough Mall, Inc. v. City of Cape Girardeau,* 693 F.2d 733 (8th Cir.1982), *cert. denied,* 461 U.S. 945, 103 S.Ct. 2122, 77 L.Ed.2d 1303 (1983), the court stated that "the defendants may not be protected by *Noerr* because their legitimate lobbying efforts may have been accompanied by illegal or fraudulent actions." *Id.* at 746.

While it is true that Cantey and the Mayor had dinner together and met privately, there is not a scintilla of evidence that they engaged in any "otherwise illegal" or "fraudulent" activities.

Professor Areeda, in his treatise on antitrust law, recognized the need to control the scope of the co-conspirator exception.

> If the conspiracy notion means anything ..., it can embrace nothing more than corrupt or bad faith decisions, the proof of which must be controlled in order to assure the proper functioning of official agencies. Fortunately, a careful definition of the relevant corruption or bad faith will dispose of many of the cases.

P. Areeda & H. Hovenkamp, *Antitrust Law,* ¶ 203.3c (Supp.1988). In his discussion regarding whether decisions based on personal bias or campaign contributions constituted bribery and were, therefore, sufficient to strip the lobbyist of antitrust immunity, Professor Areeda wrote:

> This is not the place for an elaborate definition of bribery and whether it should include campaign contributions or other assistance to the official before or during his official tenure. Perhaps it is enough to say that these customary incidents of public life are not usually thought to impugn the legality of official acts. If official action is not invalidated by such events standing alone, neither should the casting of the challenge in antitrust terms call for invalidity or damages.

*Id.* I agree, for to do otherwise is to give those who lose political battles a ticket to explore the subjective motivations of political decision-makers by filing federal antitrust suits in which it is alleged that private meetings took place, that a personal friendship between the officials and the plaintiff's competition existed, and that an anticompetitive regulation was enacted.

### IV.

The district court held that the city was immune from the antitrust laws under *Par-*

*ker v. Brown,* 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985). I agree.

The heart of *Parker* immunity is federalism. In *Parker,* the Court stated: "In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker,* 317 U.S. at 351, 63 S.Ct. at 313. In *Parker* the Court held that the acts of a state, as sovereign, are immune from the federal antitrust laws. *Id.* at 352, 63 S.Ct. at 314.

In *California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Court established a two-prong test to determine whether a private party is entitled to the state action exemption from the Sherman Act under the *Parker* doctrine. First, there must be a clearly articulated state policy to displace competition with regulation. *Id.* 445 U.S. at 105, 100 S.Ct. at 943. Second, the state must actively supervise the activity. *Id.*

The Court refined the *Midcal* test in determining whether a municipality was entitled to *Parker* immunity in its *Hallie* decision. The Court held that municipalities are not required to meet the additional burden, imposed on private parties under *Midcal,* of proving active state supervision.[2] The Court stated "[w]here the actor is a municipality, there is little or no danger that it is involved in a *private* price-fixing arrangement." *Hallie,* 471 U.S. at 47, 105 S.Ct. at 1720 (emphasis in original). While the majority agrees that the City Council was acting pursuant to a clearly articulated state policy, it nevertheless holds that the city is stripped of its *Parker* immunity.

---

2. The Court stated that active supervision prevents "a State from circumventing the Sherman Act's proscriptions 'by casting ... a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement.'" *Hallie,* 471 U.S. at 46–47, 105 S.Ct. at 1720 (quoting *Midcal,* 445 U.S. at 106, 100 S.Ct. at 943).

I fear that the holding of the majority may invite heretofore unauthorized federal antitrust lawsuits against municipalities. Losers in political battles will be able to achieve all or some of their objectives by threatening antitrust litigation and, in the process, discourage public officials from performing their public duties while they contend with antitrust allegations.

The principles of federalism have guided other courts in limiting or foreclosing the conspiracy exception to *Parker*. The court in *Boone* rejected a claim that allegations of bad faith would strip the city of its antitrust immunity:

> The availability of *Parker* immunity ... does not depend on the subjective motivations of the individual actors, but rather on the satisfaction of the objective standards set forth in *Parker* and authorities which interpret it. This must be so if the state action exemption is to remain faithful to its foundations in federalism and state sovereignty. A contrary conclusion would compel the federal courts to intrude upon internal state affairs whenever a plaintiff could present colorable allegations of bad faith on the part of defendants.

*Boone*, 841 F.2d at 892 (quoting *Llewellyn v. Crothers*, 765 F.2d 769, 774 (9th Cir. 1985)); *accord Hancock Indus. v. Schaeffer*, 811 F.2d 225, 234 (3d Cir.1987) (quoting the same passage from *Llewellyn*, 765 F.2d at 774).

The Supreme Court has also expressed concern that if *Parker* antitrust immunity is easily avoided, then antitrust litigation may have a discouraging effect on public service. In *Hoover v. Ronwin*, 466 U.S. 558, 104 S.Ct. 1989, 80 L.Ed.2d 590 (1984), the Supreme Court considered an allegation that the Arizona Committee on Bar Examinations, a private entity advising the Arizona Supreme Court, entered into a scheme to reduce competition within the legal community by raising the qualifying score on bar exams for the purpose of controlling the number of attorneys admitted to practice law within the state. The Supreme Court stated that "to look behind the actions of state sovereigns and base ...

claims of perceived conspiracies to restrain trade among the committees, commissions, or others" would emasculate the *Parker v. Brown* doctrine. *Id.* 466 U.S. at 580, 104 S.Ct. at 2001.

The majority cites several pre-*Hallie* cases for the proposition that there is a conspiracy exception to *Parker* immunity. While I have some doubt about the validity of these pre-*Hallie* cases as authority for the position of the majority, even if a conspiracy exception remains after *Hallie*, absent some proof of an illegal act or a selfish or a corrupt motive on the part of Columbia city officials, I would hold that the evidence is insufficient to strip the officials of immunity.

## V.

Omni also charged that the defendants violated the South Carolina Unfair Trade Practices Act (UTPA). S.C.Code Ann. §§ 39–5–10 to 39–5–160 (Law. Co-op.1976). I would hold that the district court correctly ruled that the claim was precluded by *Noack Enter. v. Country Corner Interiors of Hilton Head Island, Inc.*, 290 S.C. 475, 351 S.E.2d 347 (1986). Section 39–5–20(b) of the UTPA states that the intent of the state legislature was for courts interpreting the UTPA to follow interpretations of the antitrust laws by the Federal Trade Commission and the federal courts. It follows, therefore, that the South Carolina legislature intended that courts interpret the UTPA in light of *Noerr–Pennington* and *Parker*.